

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

**NO. 02-10-00157-CV**

LESIKAR OIL AND GAS CO.                    APPELLANT

V.

LEGEND SWABBING, LLC                    APPELLEE

------------

FROM THE 43RD DISTRICT COURT OF PARKER COUNTY

------------

## MEMORANDUM OPINION[1]

----------

Appellant Lesikar Oil and Gas Co. (the Company) appeals from the trial court's judgment in favor of Appellee Legend Swabbing, LLC (Legend) on Legend's suit for breach of contract and against the Company on its counterclaims. In three issues, the Company argues that the trial court erred by holding that Legend had no liability for the services of subcontractors used to perform work that Legend was contractually obligated to perform; by holding that

---

[1]*See* Tex. R. App. P. 47.4.

Legend fully performed under the contract; by refusing to hold that Legend failed to perform in a good and workmanlike manner; by failing to find that the Company had incurred $26,475.64 in expenses as a result of Legend's failure to perform in a good and workmanlike manner; and alternatively, by issuing findings of fact numbers 17 and 22. The Company also challenges the sufficiency of the evidence to support those findings. Because we hold that the trial court did not err, we affirm the trial court's judgment.

## I. Background Facts and Procedural History

The Company, which is owned by Lynwood Lesikar, operates the Dalworth No. 1 well in Parker County (the well). In May 2007, the Company hired Legend to repair a casing leak in the well after an independent contractor, Dale Lee, informed Lesikar that he suspected that the well had a leak. Lee introduced Lesikar to Gary Gardner, owner of Legend. The parties entered into a master service contract, which sets out insurance and indemnity requirements for the parties but does not specify the work Legend agreed to perform. Lesikar agreed to pay Legend $265 an hour for its work.

Prior to the repair work, Lesikar met with Gardner and gave him various notes about the condition of the well and possible location of the leak. Lesikar testified that as part of this conversation, he had informed Gardner that the well had previously had two or three squeeze jobs done, some of which had failed. Gardner testified that it was obvious that the casing had been squeezed several times. A squeeze job is a process by which cement is pumped into the pipe and

2

pushed through holes in the casing. This process, in addition to repairing casing holes, creates a cement barrier between the casing and the area outside the casing. Before injecting the cement into the casing, a removable bridge plug is placed in the pipe below the area to be repaired. Sand is placed on top of the bridge plug to protect it from the cement. After the cement is injected, water is pumped into the well to push down the cement. The well is then "squeezed" to push on the cement, pushing the water out of the cement and dehydrating it. Once the cement has set, the cement in the casing is drilled out. The mud created by this process is circulated out of the casing so that the plug can be retrieved. A cement retainer may be used in the process; a cement retainer is "a device that . . . you pump through to get cement through it" to create an area between the plug and the retainer into which the cement is pumped.

Legend repaired the leak by performing three squeeze jobs on the well. The first two squeeze jobs that Legend completed did not fix the casing leak. At trial, the parties disagreed about who was at fault for the failure of the first two attempts. Legend argued that for the first attempt, the cement company, Basic Energy Services (Basic), did not keep pressure on the well. Lesikar argued that the problem was the location of the retainer. A Basic employee testified that keeping pressure on the squeeze job would have defeated the squeeze because of the location of the retainer. As for the second attempt, Gardner testified that the squeeze failed because Basic made incorrect cement calculations, resulting

3

in too little cement being used. A Basic employee testified that Gardner told him how much cement to use on the job.

Basic employee Billy Raines testified that squeeze jobs could take multiple attempts to achieve success without anyone doing anything wrong. Lee testified that Gardner did not do anything wrong on the squeeze jobs. Jack Bradshaw, an expert called by the Company, agreed that everyone can do everything right on the first squeeze but it can still fail, and Bradshaw could not name anything that Gardner had done wrong.

The third squeeze job repaired the casing leak. Within a week, however, the pump became clogged and stopped working. At trial, the parties disputed whether the clog occurred because Legend did not circulate the well with water after completing the third squeeze job. The parties presented conflicting testimony about whether circulation with water is necessary.

Legend billed the Company for its services, and Lesikar refused to pay. Lesikar disputed the charges on the grounds that Legend had charged the Company for work that did not need to be done (such as swabbing and acidizing) and that some of the charges were for repairing holes caused by Legend rather than the casing leak that it had been hired to repair.

Legend sued the Company for breach of contract due to Lesikar's failure to pay the invoices. The Company filed a countersuit for breach of contract and fraud. The Company alleged that Legend's representations in the service agreement that it had adequate equipment and fully trained personnel capable of

4

performing services were false and a deceptive trade practice. The Company also alleged that Legend's work was substandard.

The case was tried to the bench. At trial, Gardner testified that he had followed Lesikar's orders in repairing the leak and that Legend did not have responsibility for the work performed by the service providers (such as Basic) who had provided work or equipment on the job. Gardner also testified that his understanding was that Lee was his supervisor on the job.

The Company disputed that Lee had any supervisory capacity on the job. The Company argued that Legend was responsible for the work done on the repair job and could not delegate its responsibility to other providers.

At the conclusion of the bench trial, the trial court rendered judgment for Legend and ordered that it recover damages of $58,565 and stipulated attorney's fees. The judgment ordered that the Company take nothing on its counterclaims.

The Company requested the trial court to enter findings of fact and conclusions of law. The trial court subsequently notified the parties to submit proposed findings and conclusions by April 12, 2010. Legend complied with this instruction, but Lesikar did not. On April 16, 2010, the trial court entered findings of fact and conclusions of law:

### Findings of Fact

. . . .

2.  [The Company] is the operator of the . . . Well.

3.  [Legend] was contracted by [the Company] to repair a casing leak(s) in the . . . Well.

5

. . . .

5.      [Legend] performed three squeeze jobs and one acid job on the . . . well to fix the casing leak(s).

6.      [Basic] was contracted to perform the cement work on the squeeze jobs as well as the acid job on the . . . well.

7.      [Legend] maintained the failure of the first squeeze job was the fault of [Basic] for not keeping pressure on the squeeze job.

8.      . . . Dale Lee[] also maintained the failure of the first squeeze job was the fault of [Basic] for not keeping pressure on the squeeze job.

9.      [Legend] maintained the failure of the second squeeze job was the fault of [Basic] for the substandard quality of its cement.

10.     . . . Dale Lee[] also maintained the failure of the second squeeze job was the fault of [Basic] for the substandard quality of its cement.

11.     [Basic] billed [the Company] the following invoices:

        a.      $5,285.41 — 1st squeeze job on 6/1/07

        b.      $3,414.12 — 2nd squeeze job on 6/5/07

        c.      $1,654.86 — Acid job on 6/11/07

        d.      $4,165.66 — 3rd squeeze job on 6/12/07

12.     [The Company] did not pay [Basic] for the acid job . . . or the 3rd squeeze job. . . .

13.     [Basic's] ledger sheet for [the Company] shows a credit for the acid job . . . and the 3rd squeeze job. . . .

14.     [Legend] completed work on June 21, 2007.

15.     [Legend] billed [the Company] for its work through two invoices, No. 903 in the amount of $28,355.00 and No. 904 in the amount of $30,210.00 for a job total of $58,565.00.

6

16. [Legend's] hourly rate was $265.00 and L.W. Lesikar agreed that was a reasonable rate.

17. [The Company] through its owner L.W. Lesikar and a pumper, Dale Lee, employed by [the Company,] were overseeing work performed by [Legend].

18. [Legend], through its manager Gary Gardner, was in constant contact with L.W. Lesikar and/or Dale Lee through completion of said work either in person or by telephone.

19. [Legend], through its manager Gary Gardner, provided evidence of 77 telephone calls to or from L.W. Lesikar and 96 telephone calls to or from Dale Lee through completion of the work on the . . . well.

20. All witnesses, including two employees from [Basic], who were called to tes[tify] on behalf of [the Company] as well [as] its expert Jack Bradshaw stated that it can take numerous squeeze jobs to fix a casing leak.

21. All witnesses, including two employees from [Basic], who were called to tes[tify] on behalf of [the Company] as well [as] its expert Jack Bradshaw stated that everyone can do everything right on a squeeze job and it still not be successful even after several attempts.

22. L.W. Lesikar or his pumper, Dale Lee, were at the job site and had the ultimate responsibility to order [Legend] or any other subcontractor to alter the plan of operation that was proposed for repair of the casing leak.

23. The "contract" for services gives no particular guidance for the services rendered other than representations that [Legend] "has adequate equipment in good working order and fully trained personnel capable of efficiently operating such equipment and performing services for Contractor[."]

24. During the entire period of time [Legend] made repairs to the . . . well, it had adequate equipment which was in good working order.

25. During the entire period of time[, Legend] had fully trained personnel capable of efficiently operating such equipment and

7

performing the services for which it contracted with [the Company].

26. The job assignment was to repair the casing leak and [Legend] completed the assignment.

27. [The Company]'s complaint was that [Legend] took too long and did not use the methods [L.W. Lesikar] would have used.

28. The contract did not have specifications for time and method.

29. [Legend] incurred reasonable and necessary attorney's fees of $21,000.00.

### *Findings of Fact as Conclusions of Law*

1. Any finding of fact that is a conclusion of law shall be deemed a conclusion of law.

### *Conclusions of Law*

1. [Legend] and [the Company] entered into a master service contract. The contract for services gives no particular guidance for the services rendered other than representations that [Legend] has adequate equipment in good working order and fully trained personnel capable of efficiently operating such equipment and performing services for contractor. The job assignment was to repair the casing leak and [Legend] completed the assignment.

2. [Legend] fully performed its contractual obligations to [the Company] under the contract.

3. [The Company] breached its obligations under the contract by its failure to pay for [Legend]'s services upon completion of the job.

4. A breach of contract entitles the non-breaching party [Legend] to recover from the breaching party [the Company] an additional amount of monies as compensation for the expense of retaining an attorney in the litigation. The reasonable and necessary attorney's fees by [Legend] were $21,000.00.

8

The Company requested amended and additional findings of fact, which the trial court denied, stating as its reason that Lesikar had failed to comply with the April 12 deadline.

## II. Standards of Review

Findings of fact are the exclusive province of the factfinder.[2] In a bench trial, they have the same force and dignity as a jury's answers to jury questions.[3] When findings of fact are filed and are unchallenged, they occupy the same position and are entitled to the same weight as the verdict of a jury; they are binding on an appellate court unless the contrary is established as a matter of law or there is no evidence to support the finding.[4]

The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence supporting a jury's answer.[5]

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred

---

[2]*Bellefonte Underwriters Ins. Co. v. Brown*, 704 S.W.2d 742, 744–45 (Tex. 1986).

[3]*Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991).

[4]*McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *Rischon Dev. Corp. v. City of Keller*, 242 S.W.3d 161, 166 (Tex. App.—Fort Worth 2007, pet. denied), *cert. denied*, 129 S. Ct. 501 (2008).

[5]*Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex. 1996); *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex. 1994).

9

by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact.[6]  In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not.[7]  If a party is attacking the legal sufficiency of an adverse finding on an issue on which the party had the burden of proof, and there is no evidence to support the finding, we review all the evidence to determine whether the contrary proposition is established as a matter of law.[8]

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and

---

[6]*Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960).

[7]*Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

[8]*Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989).

a new trial ordered.[9]  When the party with the burden of proof appeals from a failure to find, the party must show that the failure to find is against the great weight and preponderance of the credible evidence.[10]

When conducting a factual sufficiency review, a court of appeals must not merely substitute its judgment for that of the trier of fact.[11]  The trier of fact is the sole judge of the credibility of witnesses and the weight to be given to their testimony.[12]

A court of appeals cannot make original findings of fact; it can only "unfind" facts.[13]  Conclusions of law may not be challenged for factual sufficiency, but they may be reviewed to determine their correctness based upon the facts.[14]

---

[9]*Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

[10]*Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 651 (Tex. 1988); *see Gonzalez v. McAllen Med. Ctr., Inc.*, 195 S.W.3d 680, 681–82 (Tex. 2006).

[11]*Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

[12]*Id.*

[13]*Tex. Nat'l Bank v. Karnes,* 717 S.W.2d 901, 903 (Tex. 1986); *Inimitable Group, L.P. v. Westwood Group Dev. II, Ltd.*, 264 S.W.3d 892, 898 (Tex. App.—Fort Worth 2008, no pet.).

[14]*AMX Enters., L.L.P. v. Master Realty Corp.*, 283 S.W.3d 506, 519 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g); *Dominey v. Unknown Heirs & Legal Reps. of Lokomski*, 172 S.W.3d 67, 71 (Tex. App.—Fort Worth 2005, no pet.).

## III. Legend's Alleged Liability for the Services of Subcontractors

In its first issue, the Company argues that the trial court erred by holding that Legend had no liability for the services of subcontractors used to perform work that Legend was contractually obligated to provide to the Company because, as a matter of law, Legend could not delegate responsibility for the repair of the casing leak when the Company did not consent. Alternatively, the Company contends that the trial court's finding that Legend was not liable for Basic's services is against the great weight and preponderance of the evidence. We first note that the trial court made no such explicit conclusions of law or findings of fact. Secondly, even if Legend bore responsibility for the conduct of the other subcontractors, a determination we do not need to make, for Legend to have liability for Basic's performance (or the services of any other subcontractor), the trial court first must have determined that a subcontractor's performance amounted to a material breach of the contract. As the Company concedes in a footnote, the trial court made no such determination, finding only that Legend and Lee both blamed Basic for the failure of the two cement jobs, not that Basic was at fault for the failure. The trial court also found that the Company's witnesses "stated that it can take numerous squeeze jobs to fix a casing leak" and that "everyone can do everything right on a squeeze job and it still not be successful even after several attempts." As set forth above, the trial court further found,

23.   The "contract" for services gives no particular guidance for the services rendered other than representations that [Legend] "has adequate equipment in good working order and fully

trained personnel capable of efficiently operating such equipment and performing services for Contractor[.”]

24. During the entire period of time [Legend] made repairs to the . . . well, it had adequate equipment which was in good working order.

25. During the entire period of time[, Legend] had fully trained personnel capable of efficiently operating such equipment and performing the services for which it contracted with [the Company].

27. [The Company]'s complaint was that [Legend] took too long and did not use the methods [L.W. Lesikar] would have used.

28. The contract did not have specifications for time and method.

The Company has not challenged any of these findings, and there is evidence to support them.[15] The contract provides no specifications regarding the type of work Legend was to perform. It does provide the following, "Subcontractor [Legend] represents that it has adequate equipment in good working order and fully trained personnel capable of efficiently operating such equipment and performing services for Contractor [the Company]." Gardner warned Lesikar before beginning the job that because of the well's history and age, "this was a high risk squeeze . . . that . . . very possibly could take two to three times to squeeze it off." Lee testified that Gardner did not do anything wrong on the squeeze jobs. Bradshaw agreed with a Basic employee's testimony that everyone can do everything right on the first squeeze but it can

---

[15]*See McGalliard*, 722 S.W.2d at 696; *Rischon Dev. Corp.*, 242 S.W.3d at 166.

13

still fail and could not name anything that Gardner had done wrong. Basic employee Billy Raines testified,

> Q. And down in that hole, there's no—a person wouldn't want to bet, would he, that the first time you do a squeeze job, it's going to work?
>
> A. No. A person wouldn't want to bet.
>
> Q. Based on your experience, have you been on other jobs where sometimes it's taken two, three, maybe as many as half a dozen times to prepare—or to repair a hole in the casing?
>
> A. Yes.
>
> Q. All right. So it's not unusual, is it, for it to take three times to repair a hole in a casing?
>
> A. Correct.
>
> Q. And that doesn't necessarily mean that anybody did anything wrong, correct?
>
> A. Correct.
>
> Q. It could just be the dynamics of the hole and the geology that's down there; is that right?
>
> A. Yes, sir.

Because the Company does not challenge the findings and the evidence supports them, they are binding on us.[16] We therefore hold that (1) the Company did not establish that Basic's performance amounted to a breach for which Legend was liable as a matter of law and (2) the trial court's refusal to hold Legend liable for a breach by Basic that the trial court did not find occurred is not

---

[16] *See McGalliard*, 722 S.W.2d at 696; *Rischon Dev. Corp.*, 242 S.W.3d at 166.

14

against the great weight and preponderance of the evidence. We overrule the Company's first issue.

## IV. Legend's Performance of the Contract

In its second issue, the Company contends that the trial court erred by holding that Legend fully performed its contractual obligations, by refusing to find that Legend failed to perform in a good and workmanlike manner, by refusing to find that Legend failed to perform in a good and workmanlike manner by failing to circulate the well clean at the conclusion of the third squeeze job, and by refusing to find that the Company incurred $26,475.64 in expenses as a result of Legend's failure to so circulate the well. Included in this issue are challenges to the legal and factual sufficiency of the evidence to support the trial court's finding that Legend "completed the assignment" and the trial court's failure to find that Legend did not perform in a good and workmanlike manner, as well as the contention that the trial court's conclusion that Legend fully performed is wrong as a matter of law.

The parties appear to agree that the implied warranty of good workmanship applies here. The Texas Supreme Court defines "good and workmanlike" as "that quality of work performed by one who has the knowledge, training, or experience necessary for the successful practice of a trade or occupation and performed in a manner generally considered proficient by those

15

capable of judging such work."[17] Without holding that the implied warranty of good workmanship applies in this case, we hold that the evidence supports any refusal by the trial court to hold that Legend did not perform in a good and workmanlike manner. Lesikar does not challenge these findings:

18. [Legend], through its manager Gary Gardner, was in constant contact with L.W. Lesikar and/or Dale Lee through completion of said work either in person or by telephone.

19. [Legend], through its manager Gary Gardner, provided evidence of 77 telephone calls to or from L.W. Lesikar and 96 telephone calls to or from Dale Lee through completion of the work on the . . . well.

. . . .

23. The "contract" for services gives no particular guidance for the services rendered other than representations that [Legend] "has adequate equipment in good working order and fully trained personnel capable of efficiently operating such equipment and performing services for Contractor[."]

24. During the entire period of time [Legend] made repairs to the . . . well, it had adequate equipment which was in good working order.

25. During the entire period of time[, Legend] had fully trained personnel capable of efficiently operating such equipment and performing the services for which it contracted with [the Company].

. . . .

27. [The Company]'s complaint was that [Legend] took too long and did not use the methods [L.W. Lesikar] would have used.

28. The contract did not have specifications for time and method.

---

[17]*Melody Home Mfg. Co. v. Barnes,* 741 S.W.2d 349, 354 (Tex. 1987).

16

The Company contends that Legend's placement of the retainer below the casing leak and top set of perforation holes breached the implied warranty of performance in a good and workmanlike manner, yet the Company's contention appears to be based solely on Lesikar's conclusions drawn from a crude drawing by Gardner that the parties agreed was not drawn to scale. Further, to the extent that the placement of the retainer was below the casing leak and the top set of perforation holes, such placement nonetheless ultimately worked because the leak was fixed.

Gardner warned Lesikar before beginning the job that because of the well's history and age, "this was a high risk squeeze . . . that . . . very possibly could take two to three times to squeeze it off." In addition to denying that he had had anything to do with perforating additional holes, Gardner gave detailed testimony explaining each step that he took on the job and why. He also testified about his extensive experience in the industry, the experience of the workers who helped him on the job, and the quality of his equipment. Finally, he testified that he believed that he had performed the work in a good and workmanlike manner.

Lee also testified extensively about the steps taken to complete the job. Lee testified that Gardner did not do anything wrong on the squeeze jobs. Basic employee Billy Raines testified,

> Q.  And down in that hole, there's no—a person wouldn't want to bet, would he, that the first time you do a squeeze job, it's going to work?

17

A. No. A person wouldn't want to bet.

Q. Based on your experience, have you been on other jobs where sometimes it's taken two, three, maybe as many as half a dozen times to prepare—or to repair a hole in the casing?

A. Yes.

Q. All right. So it's not unusual, is it, for it to take three times to repair a hole in a casing?

A. Correct.

Q. And that doesn't necessarily mean that anybody did anything wrong, correct?

A. Correct.

Q. It could just be the dynamics of the hole and the geology that's down there; is that right?

A. Yes, sir.

Bradshaw agreed that everyone can do everything right on the first squeeze but it can still fail, and he could not name anything that Gardner had done wrong. Finally, the third squeeze job successfully repaired the casing leak. We therefore hold that the evidence is legally and factually sufficient to support the trial court's refusal to find that Legend breached any implied warranty of good workmanship generally.

Specifically, though, the Company contends that the trial court erred by refusing to find that Legend failed to perform in a good and workmanlike manner by failing to circulate the well clean at the conclusion of the third squeeze job. After completing the squeeze, Legend swabbed the well to clean it out but did not

18

circulate the well with water. The parties presented conflicting testimony about whether circulation or swabbing is the better method to clean the well. Gardner testified,

> When I removed that retrievable bridge plug, that 3,000 feet of fluid goes down. The producing zone is partially depleted, not much pressure on it. So when the weight of that fluid hits, it actually—the zone actually drinks some of that fluid. We then run our tubing down and swab it to where we pull that fluid back out—
>
> . . . .
>
> But this fluid's coming down, goes into the formation. Then whenever you swab it, you continue to swab it until it pulls all this fluid back out of this formation, which actually cleans the formation better than circulating it would.
>
> And that was what—that was what we did in this case, is we swabbed the well clean instead of circulating it clean. Basically accomplishing the same thing.

We hold that the evidence is legally and factually sufficient to support the trial court's refusal to find that Legend breached any implied warranty of good workmanship by failing to circulate the well clean after the third squeeze job. Further, because the Company does not contest the trial court's findings that

23. The "contract" for services gives no particular guidance for the services rendered other than representations that [Legend] "has adequate equipment in good working order and fully trained personnel capable of efficiently operating such equipment and performing services for Contractor[;"]

24. During the entire period of time [Legend] made repairs to the . . . well, it had adequate equipment which was in good working order[;]

25. During the entire period of time[, Legend] had fully trained personnel capable of efficiently operating such equipment and

19

performing the services for which it contracted with [the Company;]

. . . .

27. [The Company]'s complaint was that [Legend] took too long and did not use the methods [L.W. Lesikar] would have used[; and]

28. The contract did not have specifications for time and method[,]

and because of our holdings regarding the trial court's refusal to find that Legend breached an implied warranty of good workmanship, we hold that the trial court properly concluded that Legend fully performed its assignment and that the evidence is legally and factually sufficient to support the trial court's finding that Legend completed its assignment. We therefore also hold that the trial court did not err by failing to find that the Company incurred $26,475.64 in expenses as a result of Legend's failure to circulate the well clean with water at the end of the third squeeze job. We overrule the Company's second issue in its entirety.[18]

## V. Findings of Fact Numbers 17 and 22

In its third issue, the Company argues in the alternative that the trial court erred by making findings of fact numbers 17 and 22 because they are materially inconsistent with the findings that Legend was contractually obligated to repair the casing leak or, alternatively, because the evidence is insufficient to support those findings. The findings provide,

---

[18] *See Gonzalez*, 195 S.W.3d at 681–82; C*ropper*, 754 S.W.2d at 651.

20

17. [The Company] through its owner L.W. Lesikar and a pumper, Dale Lee, employed by [the Company] were overseeing work performed by [Legend; and]

. . . .

22. L.W. Lesikar or his pumper, Dale Lee, were at the job site and had the ultimate responsibility to order Legend or any other subcontractor to alter the plan of operation that was proposed for repair of the casing leak.

Because these findings are immaterial, given the absence of any finding that a breach occurred on the part of Legend or any other subcontractor and given our holdings above, we overrule the Company's third issue.[19]

## VI. Conclusion

Having overruled the Company's three issues, we affirm the trial court's judgment.

LEE ANN DAUPHINOT
JUSTICE

PANEL:  DAUPHINOT, WALKER, and MCCOY, JJ.

DELIVERED:  August 18, 2011

---

[19]*See* Tex. R. App. P. 44.1(a); *Probus Props. v. Kirby*, 200 S.W.3d 258, 264 (Tex. App.—Dallas 2006, pet. denied) ("An appellate court may disregard a jury finding on a question that is immaterial."); *Loaiza v. Loaiza*, 130 S.W.3d 894, 904 (Tex. App.—Fort Worth 2004, no pet.).