

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-07-289-CV

INIMITABLE GROUP, L.P.
AND SOITIS, L.L.C.                                          APPELLANTS

V.

WESTWOOD GROUP
DEVELOPMENT II, LTD.                                          APPELLEE

------------

FROM THE 48TH DISTRICT COURT OF TARRANT COUNTY

------------

## OPINION

------------

### Introduction

This case involves a dispute over whether a contract for the construction and sale of an office and warehouse building was validly terminated by the purchaser before closing. In five issues, appellants Inimitable Group, L.P. and Soitis, L.L.C. challenge (1) the trial court's determination that they did not validly terminate the contract and, consequently, (2) the trial court's final

judgment awarding damages to appellee Westwood Group Development II, Ltd. for breach of contract.  We affirm.

## Background

In February 2005, Soitis and Westwood entered into an Agreement of Purchase and Sale (Agreement) "to provide for the construction by" Westwood—and the subsequent sale to Soitis—of an office and warehouse building in Grapevine, Texas.  The Agreement provided for the building to be constructed according to certain plans and specifications, which were attached as exhibits.  The initial closing date was to be October 30, 2005.  The date the building was to be substantially completed as defined in the Agreement was October 15, 2005, "as adjusted from time to time as expressly provided" in the Agreement.  The Agreement further (1) provided that "[t]ime is of the essence," (2) required Westwood to construct the building with due diligence on or before the substantial completion date, "as extended by Excusable Delays and/or Purchaser Delays," both defined in the Agreement,[1] and (3) allowed Soitis to terminate the agreement by written notice to Westwood if substantial

---

[1] "Excusable Delay" is defined as delay in substantial completion for reasons "beyond the reasonable control of Seller," such as delay because of strikes, governmental regulatory orders, weather, or changes to the project made by the purchaser.  "Purchaser Delay" is defined as  delay in substantial completion "due to any act or omission" of the purchaser, including delay because of any changes to the project made by the purchaser.

completion had not occurred by December 31, 2005 "as extended by Purchaser Delays only and Excusable Delays."

The construction plans attached to the Agreement provided only for the construction of the exterior of the building; Soitis was responsible for its own interior finish-out. Construction on the building began in late March 2005. In April 2005, Soitis and Westwood agreed that Westwood would assist Soitis in designing the interior finish-out of the building. Westwood hired an architect to assist with the interior finish-out plans.

From April through November 2005, Tony Robertson, Soitis's president, and Nicole Meadors, a Westwood employee, corresponded by phone and email regarding various aspects of the interior and exterior design and construction of the building. Al Burtin, Westwood's chief operating officer, also participated in the process. Soitis requested several alterations to the original exterior design, including the relocation of a truck ramp, the addition of a window, and the addition of a hard coat texture to the exterior. After reviewing and making several changes to the architect's proposed drawings, Robertson approved the initial interior finish-out plans on June 21, 2005. He approved the final construction documents for the interior on September 14, 2005, which Westwood then sent out for bids on the construction costs.

3

On November 7, 2005, the day Westwood received at least one of the bids for the interior construction, Robertson and Meadors had a phone conversation about the project, after which Meadors sent Robertson an email stating, "I was curious to hear if you had found anything else out? We have put your building on hold, but need to know ASAP exactly what direction we are going to be heading in." Two days later, on November 9, 2005, Robertson, Burtin, and Meadors met regarding the project, and Robertson informed Meadors and Burtin that Soitis did not intend to occupy the building. They discussed options for the project, including having Soitis continue with the purchase and lease or sell the building. In addition, Robertson asked Meadors to investigate whether a different buyer could be found for the project. Robertson told Meadors and Burtin that he wanted to get a new appraisal on the building. Robertson's notes from that meeting indicate, "Anticipate a closing on December 1st," and contain a notation that appears to state that the architect's costs were approximately $25,000. The meeting notes also appear to contain calculations of the costs to either lease or sell the building in both improved and unimproved condition.

Despite Robertson's November 7, 2005 instruction to stop work on the building, Westwood's contractor continued construction according to its contract with Westwood. As of December 13, 2005, the only item remaining

4

to be completed was the addition of an exterior wall light, needed to replace a planned but not installed light pole that the architect had inadvertently located over a gas line.

On December 14, 2005, Meadors sent Robertson an email stating,

> We are still trying to sell your building[;] our prospect cannot meet until after the first of the year . . . so I will keep you informed.  As far as closing on your building, we want to close after Christmas but before the New Year.  Can you have all of your financing in place by this time?

Robertson responded, "Having the financing in place is not a problem.  Organizing our side for a closing in the middle of the holiday week is going to be a problem.  The way things stand now, we are all out on vacation.  We can try to figure something out this afternoon."  Meadors sent Robertson an email on January 9, 2006 inquiring whether Soitis "had gotten anything scheduled for [the] building" and asking him to email her "an update so we can get a closing date set."  Robertson responded,

> I forwarded the information to Chase last Thursday.  My contact assured me they would evaluate the appraiser to determine if they could use him in our situation.  I think you are correct, that this would be the most effective way to get us the appraisal we want in the shortest time. . . .  I will be talking with Chase tomorrow at the latest.

Burtin finally sent Robertson an email on January 27, 2006, stating that Westwood wanted to schedule closing for February 6, 2006.  Burtin went on

to state that the building had been substantially completed on November 30, 2005 and that the construction had run over schedule because of the changes to the exterior plans requested by Soitis, "none of which [according to Burtin] pertained to the seller's actions." Soitis did not challenge Burtin's contention that it was the cause of the construction delay.

On January 31, 2006, Meadors sent Robertson an email noting that he had told her Soitis was "changing the name on the [Agreement] from Soitis to another entity" and asking the name so that an assignment could be drafted. Soitis formed Inimitable in February 2006 and assigned its rights under the Agreement to Inimitable. According to Steve Staneff, Soitis's former president and an equity holder, Inimitable was formed for the sole purpose of purchasing the building as an investment with the intent to lease it back to Soitis.[2]

Robertson and Meadors continued to correspond regarding closing, with Meadors attempting to schedule a February 15, 2006 closing. Robertson told her that he would "make every effort for 2:00 on the 15th, [but] the 16th would be easier." He also stated that he "would like to wrap this up as well." Meadors met with the new appraiser on February 6, 2006. However, unbeknownst to Westwood, Robertson, had already begun looking at the

_____

[2] Robertson testified at trial, however, that after November 9, 2005, Soitis never intended to occupy the building.

Agreement to determine if Inimitable could terminate the transaction. Accordingly, sometime during the time he was discussing closing with Meadors, Robertson was discussing termination options with counsel. After confirming that the City had not issued a certificate of occupancy for the building exterior because the wall light had not been installed, appellants' counsel sent a letter to Westwood terminating the Agreement under section 6.3, which allowed the buyer to terminate if the building had not been substantially completed by December 31, 2005. In the letter, counsel also demanded that Westwood return the $50,000 earnest money Soitis had paid into escrow when it first entered into the Agreement.

After Westwood refused to return the earnest money, appellants sued Westwood in March 2006, claiming that Inimitable had validly terminated the Agreement and seeking return of the earnest money as damages for breach of contract. They also sought a declaratory judgment that the Agreement is "terminated, invalid, void, and/or unenforceable." Westwood asserted counterclaims for breach of contract, negligence, and quantum meruit. In its Third Amended Original Answer, Westwood also included specific denials, claiming, among other things, that all conditions precedent to appellants' right to relief had not occurred: specifically, that appellants prevented Westwood from performing the Agreement by instructing it to stop construction on the

7

building. Westwood also pled the affirmative defenses of appellants' breach and failure to perform, anticipatory repudiation, waiver, promissory and equitable estoppel, laches and unclean hands, and impossibility or impracticality of performance.

After a bench trial on January 16, 2007, the trial court ruled in favor of Westwood, awarding it damages of $157,946 plus prejudgment interest of $13,209.05—a total of $171,155.05—for breach of contract. It also awarded Westwood $65,000 in trial attorney's fees and conditional attorney's fees on appeal for $20,000 each to an appeal to the court of appeals and a fully briefed appeal in the supreme court. It also split costs between Inimitable and Soitis. The trial court signed findings of fact and conclusions of law on October 18, 2007.

## Issues on Appeal

Appellants bring five issues on appeal, in which they challenge the following findings and conclusions of the trial court: (1) that Soitis and Westwood entered into a second, oral agreement for Westwood to coordinate the interior design of the building, (2) that Soitis either anticipatorily repudiated or breached the second, oral agreement, or both, by failing to execute change orders incorporating the interior design work into the Agreement, (3) that Westwood was excused from performance under the Agreement after Soitis's

8

anticipatory repudiation, breach, or both of the second, oral agreement, (4) that Soitis should be estopped from claiming Westwood breached the Agreement, and (5) that Soitis waived any failure by Westwood to comply with the Agreement.

**Standard of Review**

Findings of fact entered in a case tried to the court have the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence supporting a jury's answer. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex. 1996); *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex. 1994). A court of appeals cannot make original findings of fact; it can only "unfind" facts. *Tex. Nat'l Bank v. Karnes,* 717 S.W.2d 901, 903 (Tex. 1986); *Zeptner v. Zeptner*, 111 S.W.3d 727, 734 (Tex. App.—Fort Worth 2003, no pet.) (op. on reh'g).

Conclusions of law may not be challenged for factual sufficiency, but they may be reviewed to determine their correctness based upon the facts. *Citizens Nat'l Bank v. City of Rhome*, 201 S.W.3d 254, 256 (Tex. App.—Fort Worth 2006, no pet.); *Dominey v. Unknown Heirs and Legal Representatives of Lokomski*, 172 S.W.3d 67, 71 (Tex. App.—Fort Worth 2005, no pet.).

9

**Existence of Oral Agreement for Interior Finish-out**

In their first issue, appellants contend that the trial court incorrectly concluded that Soitis and Westwood entered into a valid, binding second agreement for the interior finish-out of the building because there is no evidence that the terms of such an agreement were sufficiently definite so as to be enforceable. In their second issue, appellants contend that because there is no evidence of an enforceable second agreement, they cannot have anticipatorily repudiated it.

Whether an agreement is legally enforceable or binding is a question of law. *Searcy v. DDA, Inc.*, 201 S.W.3d 319, 322 (Tex. App.—Dallas 2006, no pet.); *Oakrock Exploration Co. v. Killam*, 87 S.W.3d 685, 690 (Tex. App.—San Antonio 2002, pet. denied). To be enforceable, a contract must be sufficiently definite in its material terms so as to enable the court to ascertain the parties' intentions. *Fort Worth ISD v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000); *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992). What terms are "material" to a contract should be determined on an agreement-by-agreement basis. *T.O. Stanley Boot Co.*, 847 S.W.2d at 221 ("Each contract should be considered separately to determine its material terms."). When an essential term is left open for future negotiation, there is no binding contract. *Id*.

10

The terms of an oral agreement may be established by direct or circumstantial evidence. *Harris v. Balderas*, 27 S.W.3d 71, 77 (Tex. App.—San Antonio 2000, pet. denied). In determining whether an oral contract exists, we "look to the communications between the parties and to the acts and circumstances surrounding those communications." *Id*.

Appellants contend that they cannot have entered into an enforceable agreement for the interior finish-out because there was no agreed upon fee for Westwood's services—and thus no way to determine the final cost of the agreement—a0nd no agreed upon due date for the finished product.

When a contract does not set forth a definite price but all other elements of a contract have been met, the trial court may imply a reasonable price. *KW Constr. v. Stephens & Sons Concrete Contractors, Inc*., 165 S.W.3d 874, 883–84 (Tex. App.—Texarkana 2005, pet. denied); *Buxani v. Nussbaum*, 940 S.W.2d 350, 353 (Tex. App.—San Antonio 1997, no writ). Thus, when the parties have done everything else necessary to make a binding agreement for services, their failure to specify a price does not leave the contract so incomplete that it cannot be enforced. *KW Constr*., 165 S.W.3d at 884; *Burnside Air Conditioning & Heating, Inc. v. T.S. Young Corp*., 113 S.W.3d 889, 894–95 (Tex. App.—Dallas 2003, no pet.); *Pennington v. Jerry F.*

11

*Gurkoff, D.O., P.A.*, 899 S.W.2d 767, 770 (Tex. App.—Fort Worth 1995, writ denied).

Additionally, the absence of a duration term for a contract "does not necessarily suggest that the parties did not enter into an enforceable agreement." *Cytogenix, Inc. v. Waldroff*, 213 S.W.3d 479, 486 (Tex. App.—Houston [1st Dist.] 2006, pet. denied); *Avila v. Gonzalez*, 974 S.W.2d 237, 244 (Tex. App.—San Antonio 1998, pet. denied) (noting that, "[w]hen the duration of a contract is not expressly dictated by the agreement, courts will frequently presume that the parties intended the agreement to last for a reasonable time"). If no time for performance is stated in the contract, the law may imply a reasonable one if the contract is "sufficiently definite for a court to be able to fix the time when it can be enforced." *Moore v. Dilworth*, 142 Tex. 538, 179 S.W.2d 940, 942 (1944); *Cytogenix*, 213 S.W.3d at 486; *Avila*, 974 S.W.2d at 245 (noting that reasonable duration may be implied "in cases where the agreement contemplates that one party will make substantial expenditures or other investments in accordance with performance").

Here, Robertson testified that Soitis and Westwood had an oral agreement for Westwood to engage the architect to provide interior design services for the project. Robertson signed off on initial drawings and on final construction documents prepared by the architect for that purpose. He was

actively engaged in the design process, making comments to the drawings and suggesting revisions based on Soitis's specific needs. When Westwood's counsel asked him at trial whether he had agreed to pay Westwood for its expenses in engaging the architect, Robertson said, "Yes."

Burtin testified about the process by which Westwood and Soitis entered into their oral agreement regarding the interior finish-out of the building. He explained as follows:

> Here's how the process works: We . . . talked about okay, yes, our willingness to fill that role. And then what we typically do with every person, with every client, is we go through the process of design.
>
> Then after design is signed off on, then we go through the process of obtaining construction documents. And then after the construction documents are acquired, then they have to be bid out. And then we go through the selection of the bidding process to get the best contractor. And then that is awarded to that best contractor, and then we know a price at that point in time.

He explained that it is impossible to determine a final price for the interior finish-out until the entire process is complete. However, he did testify regarding expenses that

> we would go through this process and get to a point where we have a number. And then at that point in time, we will add a margin on top of the best bid number. And then that is the number that we will use to add to the different expanded scope of work which was requested of us.

13

Thus, Burtin's testimony corroborates Robertson's that Soitis agreed to at least reimburse Westwood for its expenses related to providing the interior design services. Accordingly, we do not believe that the agreement was indefinite for failure to provide a final, agreed upon price for those services. *See Buxani*, 940 S.W.2d at 353.

Moreover, we do not believe that the agreement is unenforceable for lack of a specific term for completion of the services. Burtin testified that Westwood representatives explained the interior design and construction process to Soitis, and the parties were actively engaged in the design process throughout the summer while the exterior shell construction was ongoing. The trial court found that Soitis initially intended to occupy the building and that it could save time and money by working on the interior finish-out during construction of the exterior as opposed to waiting until the exterior was completed before beginning the interior finish-out; appellants do not challenge that finding. Thus, the trial court impliedly found that Soitis intended for the interior finish-out to be completed within a reasonable time after construction of, and closing on, the exterior part of the building, so as to provide Soitis with the maximum savings of time and money.

Based on the foregoing, we conclude and hold that the trial court did not err by determining that Soitis and Westwood entered into an enforceable oral

14

agreement for the interior finish-out of the building. We overrule appellants' first issue. Because appellants' second issue—whether the trial court erred by determining that appellants anticipatorily repudiated the interior finish-out agreement—is contingent upon their argument that the oral agreement was unenforceable, we overrule their second issue as well.

### Whether Westwood Excused from Performing Under Agreement of Purchase and Sale

In their third issue, appellants contend that the trial court erred by concluding that Westwood was excused from performing under the Agreement after appellants either anticipatorily repudiated or breached the second agreement for interior design services, or both.

If, after a party breaches a contract, the other party continues to insist on performance by the defaulting party, the nondefaulting party is not excused from performing its part of the contract as a result of the defaulting party's breach; the contract continues in force for the benefit of both parties. *Kennedy Ship & Repair L.P. v. Pham*, 210 S.W.3d 11, 25 (Tex. App.—Houston [14th Dist.] 2006, no pet.); *Houston Belt & Terminal Ry. v. J. Weingarten, Inc.*, 421 S.W.2d 431, 435 (Tex. Civ. App.—Houston [1st Dist.] 1967, writ ref'd n.r.e.). Thus, when one party materially breaches a contract, the nondefaulting party is forced to elect between two courses of action, i.e., continuing performance

15

or ceasing performance. *Pham*, 210 S.W.3d at 25; *Chilton Ins. Co. v. Pate & Pate Enters., Inc.*, 930 S.W.2d 877, 887–88 (Tex. App.—San Antonio 1996, writ denied). Treating the contract as continuing after a breach deprives the nondefaulting party of any excuse for terminating its own performance. *Pham*, 210 S.W.3d at 25; *Chilton Ins.*, 930 S.W.2d at 888.

According to appellants, Westwood failed to elect which remedy it wished to pursue against appellants: either (1) insist on performance and remain bound by all terms of the Agreement or (2) treat appellants' actions as a breach and eschew any performance by appellants; in other words, appellants contend that by continuing to seek closing on the exterior, Westwood consciously decided to forego the benefit of being able to claim a prior breach of the Agreement by appellants. Appellants' did not raise this argument at trial or in their pleadings, nor did they try it by consent.[3] *Mastin v. Mastin*, 70 S.W.3d 148, 154 (Tex. App.—San Antonio 2001, no pet.) ("Trial by consent is intended to cover the exceptional case where it clearly appears from the record as a whole that the parties tried the unplead issue."). Because

---

[3] Although appellants' counsel did ask several questions related to Westwood's continuing construction of the shell after Robertson instructed them to put the building on hold, those questions were clearly related to an attempt to prove that Westwood, rather than appellants, was responsible for the delays in substantial completion of the exterior.

16

appellants' argument is in the nature of an avoidance to Westwood's affirmative defense of excuse, it too is an affirmative defense that appellants were required to plead. TEX. R. CIV. P. 94; *Compass Bank v. MFP Fin. Servs, Inc.*, 152 S.W.3d 844, 852 (Tex. App.—Dallas 2005, pet. denied). Because they did not do so, they are not entitled to rely on Westwood's alleged failure to elect its remedies to support reversal of the judgment on appeal. *Compass Bank*, 152 S.W.3d at 852, 857.

Moreover, appellants did not challenge paragraph 34 of the trial court's findings of fact and conclusions of law, which states, "Substantial completion of the building was timely, and all conditions precedent were met by Westwood." Thus, appellants failed to challenge an alternative finding of the trial court that supports its judgment: that Westwood did not fail to perform its obligations under the Agreement.[4] We overrule appellants' third issue.

---

[4] When findings of fact are filed and are unchallenged, they occupy the same position and are entitled to the same weight as the verdict of a jury; they are binding on an appellate court unless the contrary is established as a matter of law or there is no evidence to support the finding. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *Raman Chandler Props., L.C. v. Caldwell's Creek Homeowners Ass'n, Inc.*, 178 S.W.3d 384, 390 (Tex. App.—Fort Worth 2005, pet. denied).

17

**Whether Appellants Estopped from Claiming Westwood Breached Agreement**

In their fourth issue, appellants contend that the trial court erred by concluding that appellants are estopped from claiming Westwood breached the Agreement first. Initially, they contend that equitable principles, such as estoppel, are not applicable in breach of contract cases. Such a contention is incorrect, however, because estoppel is routinely applied by courts in contract cases. *See, e.g., Cal-Tex. Lumber Co. v. Owens Handle Co.*, 989 S.W.2d 802, 821 (Tex. App.—Tyler 1999, no pet.); *Wright Way Constr. Co. v. Harlingen Mall Co.*, 799 S.W.2d 415, 422 (Tex. App.—Corpus Christi 1990, writ denied).

Next, appellants contend that there is no evidence to support an estoppel finding because the evidence does not support a finding that appellants intentionally misled Westwood, nor a finding that Westwood relied on any such misrepresentation or concealment to its detriment.

Estoppel is defined in general as conduct which causes the other party to materially alter his position in reliance on that conduct. *Roberts v. Clark*, 188 S.W.3d 204, 213 (Tex. App.—Tyler 2002, pet. denied); *Braugh v. Phillips*, 557 S.W.2d 155, 158 (Tex. Civ. App.—Corpus Christi 1977, writ ref'd n.r.e.). To invoke the doctrine of estoppel, all the necessary elements of estoppel must be present. *Roberts*, 188 S.W.3d at 213; *Douglas v. Aztec Petroleum Corp.*, 695 S.W.2d 312, 317 (Tex. App.—Tyler 1985, no writ). The elements of equitable

estoppel are (1) a false representation or concealment of material facts, (2) made with knowledge, actual or constructive, of those facts, (3) with the intention that it should be acted on, (4) to a party without knowledge or means of obtaining knowledge of the facts, (5) who detrimentally relies on the representations. *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc*., 962 S.W.2d 507, 515–16 (Tex. 1998); *Argyle ISD ex rel. Bd. of Trustees v. Wolf*, 234 S.W.3d 229, 241 (Tex. App.—Fort Worth 2007, no pet.).

One of the essential requisites of estoppel is a reasonable or justified reliance on the conduct or statements of the person sought to be estopped by the person seeking the benefit of the doctrine. *Roberts*, 188 S.W.3d at 213; *Douglas*, 695 S.W.2d at 317. The purpose of estoppel is for the protection of those who have been misled by that which upon its face was fair. *Roberts*, 188 S.W.3d at 213; *Douglas*, 695 S.W.2d at 317. A person may not assert estoppel for the purpose of shielding himself from the results of his own dereliction of duty. *Roberts*, 188 S.W.3d at 213; *Douglas*, 695 S.W.2d at 317.

## Misrepresentation or Concealment

Appellants challenge the trial court's findings that Soitis changed its business plan in the summer of 2005 and concealed this fact from Westwood as well as its intentions with regard to the building. It also challenges the trial court's finding that Soitis never intended to agree on the outstanding issues and

misled Westwood into believing that it was going to close to obtain the benefit of additional contract defenses. According to appellants, the evidence conclusively shows that Robertson candidly informed Westwood that Soitis no longer intended to occupy the building and that appellants fully intended to close on the building up until Robertson received the email from Burtin regarding Purchaser Delays.

During closing arguments, the trial court stated the following:

> What concerns me about this is I've never been able to figure out based on the evidence I've heard, when your client [appellants] said they had the money, what justification they had that they kept stringing out the closing.
>
> . . . .
>
> . . . And then we have a series of reassuring e-mails and meetings accommodating the purchaser as the purchaser continues to lead on the builder that they're going to close until, oddly enough, they get just past the number of days [Westwood] pointed out that might be arguably in the delay.
>
> . . . .
>
> . . . I pretty much have reached [the] conclusion that there's some credibility issues on both sides - - and I'm worming my way through that.
>
> . . . .
>
> Pretty - - pretty limited testimony whenever a client says he didn't look at it [referring to Robertson's testimony that he did not know there was a possibility of terminating the Agreement until after Burtin sent the email alleging Purchaser Delays]. He didn't

20

testify that he didn't have lawyers reviewing it. I don't think the Indianapolis law firm came up with an overnight opinion on the contract this size without consulting with its clients. It . . . does beg me to ignore reality.

So in the engagement of the Indiana lawyers, it's something the Court may inquire into, but I'm not . . . gonna buy into the fact that the Indiana lawyers were faxed the contract the night before they authored the termination advice and told the client to do it.

It is clear from the trial court's comments that the judge did not necessarily believe Robertson's testimony regarding appellants' intentions to close the Agreement.

The trial court was entitled to disbelieve Robertson's and Staneff's testimony that Soitis intended to close on the building until just before the scheduled closing date; the trial court's comments show that it instead construed Soitis's failure to respond to Westwood's closing inquiries with any firm details as an intent not to close if at all possible. As the finder of fact, the trial court was entitled to believe or disbelieve all or part of any witness's testimony. *See Shear Cuts, Inc. v. Littlejohn*, 141 S.W.3d 264, 270–71 (Tex. App.—Fort Worth 2004, no pet.). Accordingly, there is sufficient evidence to support the trial court's finding of misrepresentation, concealment, or both on the part of Soitis as to its intentions regarding closing.

**Reliance**

Appellants also contend that Westwood cannot have relied on any misrepresentation or concealment because the evidence shows that Westwood nevertheless continued construction of the building even after Robertson's November 7, 2005 instructions to stop work on the building. However, Burtin testified that because of Robertson's instruction, Westwood did not press to obtain a certificate of occupancy for the exterior shell. According to Burtin, had Robertson not given that instruction, Westwood would have pressed the construction contractor to complete installation of the last item needed—the wall mounted light—so that a certificate could be issued. And if Westwood had been able to obtain that certificate, appellants would not have been able to terminate for the reason they relied on at trial—that construction of the exterior was not substantially complete as defined in the Agreement because a certificate of occupancy had not been issued for the shell. We conclude that this is sufficient evidence to support the trial court's findings and conclusions on estoppel.

We overrule appellants' fourth issue.

### Whether Trial Court Correctly Concluded That Appellants Waived Right to Terminate Because of Westwood's Failure to Substantially Complete

In their fifth and final issue, appellants contend that the trial court erred by concluding that Soitis waived any failure by Westwood to comply with all

22

of its obligations under the Agreement.  According to appellants, because waiver requires a knowing and intentional relinquishment of a right—and Robertson did not know the extent of appellants' rights under the Agreement until he reviewed it after receiving Burtin's January 21 email—appellants cannot have waived those enforcement rights.

However, we have already pointed out the trial court's skepticism regarding Robertson's knowledge of the extent of the contents of the Agreement.  Moreover, a party to a contract is presumed to have read and understood its contents. *UBS Fin. Servs., Inc. v. Branton*, 241 S.W.3d 179, 189 (Tex. App.—Fort Worth 2007, no pet.); *see Mikey's Houses LLC v. Bank of Am., N.A.*, 232 S.W.3d 145, 167 (Tex. App.—Fort Worth 2007, no pet. [mand. pending]) (Livingston, J., dissenting).  Accordingly, we conclude and hold that the trial court did not err by concluding that appellants waived any failure of Westwood to comply with the Agreement.  We overrule appellants' fifth and final issue.

## Conclusion

Having overruled appellants' five issues, we affirm the trial court's judgment.

TERRIE LIVINGSTON
JUSTICE

PANEL: CAYCE, C.J.; LIVINGSTON and HOLMAN, JJ.

DELIVERED: August 14, 2008

23