

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-13-00164-CV

IN THE INTEREST OF A.I.T-A. AND
D.C.T-A.

----------

### FROM THE 233RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellants C.A-T. and S.T. (Mother and Father respectively; collectively, the parents) appeal from the trial court's order terminating their parental relationship with A.I.T-A. and D.C.T-A. (Daughter and Son respectively; collectively, the children) and naming the paternal grandmother (Grandmother) as sole managing conservator (SMC) and the maternal grandmother (Grandma) as possessory conservator (PC). In six issues, the parents challenge the legal and factual sufficiency of the evidence supporting the trial court's best interest

---

[1]*See* Tex. R. App. 47.4.

finding and the trial court's findings on the termination grounds of dangerous environment, failure to support, and use of a controlled substance; alternatively challenge the legal and factual sufficiency of the evidence supporting the appointment of Grandmother as SMC and Grandma as PC; and contend that the trial court abused its discretion by awarding $30,000 in attorney's fees from the parents to Grandmother's trial counsel. Because we hold that the evidence is legally and factually sufficient to support termination and that the trial court's award of attorney's fees to Grandmother's trial counsel and against the parents was not an abuse of discretion, we affirm the trial court's judgment.

**Background Facts**

In April 2009, Grandmother and her husband (Grandfather; collectively Grandparents) filed suit for conservatorship and child support, and Grandma intervened for possession and access. According to Grandmother's affidavit in support of Grandparents' original petition for joint managing conservatorship, when Mother was pregnant with Daughter, who was born in June 2006, Father held a gun to Mother's stomach and threatened to kill her. In late March 2009, Grandmother further alleged, he held a hammer and threatened to kill Mother in the children's presence. In early April 2009, before Grandparents filed their petition, the Texas Department of Family and Protective Services (TDFPS) had removed the children from their parents because of the parents' domestic violence issues and crystal methamphetamine use and placed the children with Grandparents.

2

In April 2009, Grandparents and Grandma were named temporary joint managing conservators (JMCs), with Grandparents given the right to designate the children's primary residence. Grandma was awarded possession of the children according to the standard possession order, and the parents were awarded separate, limited weekly visitation supervised by their respective mothers. The parents were each ordered to pay Grandparents $50 monthly in child support.

In September 2011, Grandma moved for drug screening of all adult parties involved—Grandparents, Grandma, and the parents—and alleged that Father had moved in with Grandparents and was still "abusing illegal substances along with certain members of his family." Also in September 2011, Grandma filed a "motion to clarify agreed temporary orders," in which she requested that the parents be ordered to immediately undergo hair follicle testing and to submit to future random hair follicle testing. In November 2011, pursuant to Grandparents' and Grandma's agreement, the trial court ordered drug testing of Grandparents. Both those drug tests came back positive for hydrocodone, for which Grandmother, but not Grandfather, had a prescription. The trial court later found that Grandfather had no biological relationship with the children. Grandfather nonsuited his claims.

On May 24, 2012, Grandmother filed an original petition to terminate the parent-child relationship between the children and their parents. Grandmother sought to be continued as the children's JMC with the exclusive right to

3

determine their primary residence and also pled for attorney's fees, expenses, and costs from Grandma and the parents. On June 13, 2012, Mother filed her pro se answer opposing the petition from jail. Grandma filed a general denial and a request that Grandmother pay reasonable attorney's fees, expenses, and costs. Grandma also filed a counterpetition to terminate, seeking that she and Grandmother be continued as JMCs but that she, not Grandmother, have the exclusive right to designate the primary residence of the children. Grandma again pled for Grandmother to pay reasonable attorney's fees, expenses, and costs. On March 6, 2013, Grandma filed her second amended petition in intervention, seeking to be named a JMC along with Grandparents and to have possession or access of the children under an expanded standard possession order. She also requested that the parents be appointed "possessory conservators with supervised visitation only if deemed in the child[ren]'s best interest for their safety and welfare or with no visitation at the present time if deemed appropriate considering the current circumstances." This petition contains no request for attorney's fees.

After the March 18, 2013 trial, the trial court issued a letter announcing the trial court's rendition terminating the parent-child relationships between the children and the parents, appointing Grandmother as SMC, appointing Grandma as PC with the same possession schedule that she had been enjoying since November 11, 2011 (six hours on every first, third, and fifth weekends), and admonishing Grandma that "permitting the association of the children with

4

[Father] and/or [Mother] will be considered an objective act of bad faith and conduct that is contrary to the best interest of the children."

The "Final Order Granting Termination of Parental Rights and Final Order on Suit Affecting the Parent Child Relationship" contains those rulings from the rendition. Additionally in the decree, the trial court found that the parents

> knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endanger[ed] the physical or emotional well-being of the children. In addition they have failed to support the children in accordance with his or her ability during a period of one year ending within six months of the date of the filing of the petition. Further, the parents have used a controlled substance (as defined by chapter 481 of the Texas Health and Safety Code) in a manner that endangered the health or safety of the children and failed to complete a court-ordered substance abuse treatment program[.]

The trial court also found that termination of the parent-child relationships between the parents and children was in the children's best interest. Finally, the trial court additionally found that

- Grandmother's attorney "incurred attorney's fees and costs . . . in the total amount of $30,000.00";

- the attorney's "fees are a reasonable and customary fee for an attorney" with Grandmother's attorney's "experience practicing in Tarrant County, Texas";

- Grandmother's attorney's "services were for the benefit of the children . . . and were reasonable and necessary to protect the emotional and physical welfare of the children"; and

- Grandmother's attorney "is entitled to recover from [Father and Mother] jointly and severally $30,000.00 over and against the Respondents herein, the amount shall include interest from March 21, 2013, for such fees, costs and expenses."

**Endangerment Evidence**

In their first issue, the parents contend that the evidence is legally and factually insufficient to support the trial court's finding that they knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being.[2] As we have explained in previous cases,

> Endangerment means to expose to loss or injury, to jeopardize. The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child. Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being. Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child.[3]

Specifically, a parent's abusive or violent conduct may produce an endangering environment.[4] Likewise, illegal drug use and related criminal activity will also

---

[2]*See* Tex. Fam. Code Ann. § 161.001(1)(D) (West Supp. 2013).

[3]*In re J.W.*, No. 02-08-00211-CV, 2009 WL 806865, at *4 (Tex. App.—Fort Worth Mar. 26, 2009, no pet.) (mem. op.) (citations omitted); *see also In re I.C.W.*, No. 02-12-00226-CV, 2013 WL 173746, at *3 (Tex. App.—Fort Worth Jan. 17, 2013, no pet.) (mem. op.).

[4]*I.C.W.*, 2013 WL 173746, at *3; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.).

6

support a finding that the children's surroundings endanger their physical or emotional well-being.[5]  Finally,

> [a]n environment which routinely subjects a child to the probability that she will be left alone because her parents are once again jailed, whether because of the continued violation of probationary conditions or because of a new offense growing out of a continued use of illegal drugs, or because the parents are once again committed to a rehabilitation program, endangers both the physical and emotional well-being of a child.[6]

Grandparents, Grandma, the parents, and Grandmother's trial counsel testified at the bench trial.  Additionally, Grandmother's trial counsel read the parents' deemed admissions into the record,[7] and Mother's written answers to the requests for admission and interrogatories were admitted with no objection.[8]

Grandmother testified that she originally filed the conservatorship case in April 2009 because

> CPS came to the house to do some drug testing on [the parents], and she admitted and he tested positive.  And so when [the CPS

---

[5]*I.C.W.*, 2013 WL 173746, at *3; *J.T.G.*, 121 S.W.3d at 125.

[6]*I.C.W.*, 2013 WL 173746, at *3.

[7]*See* Tex. R. Civ. P. 198.2(c) (providing if response is untimely served, request is considered admitted without court order), 198.3 (providing "[a] matter admitted under this rule is conclusively established as to the party making the admission" absent exceptions not present here); *Marshall v. Vise*, 767 S.W.2d 699, 700 (Tex. 1989) (holding unanswered requests for admissions are automatically deemed admitted unless court on motion permits withdrawal or amendment; once admitted, admission is judicial admission, whether deemed or otherwise).

[8]*See Marshall*, 767 S.W.2d at 700 (holding party waives right to rely on deemed admissions by failing to object to introduction of contrary evidence).

investigator] was leaving, she said that—you know, I asked her, ["]So what do we do now since they flunked their[—?"] And she said, ["]Well, you have to go to court to get the children, to have— you know, so they won't go to foster care or somewhere else.["]

Grandmother also testified that the couple's domestic violence in their home, about which she learned from CPS, likewise precipitated her filing suit. Grandmother stated at trial that she believed that the "children were in physically and emotionally harmful environments" when in the possession of Father and Mother.

Grandmother testified that she decided to file the May 2012 termination petition quickly "after that final [conservatorship] trial" when "[Mother and Father] flunked that drug test and they admitted it." The "final" trial on conservatorship, according to Grandma, took place in November 2011. Grandmother testified that she wanted Father's parental rights terminated, that that decision was hard for her, and that she loved her son but "just wish[ed] he'd ma[d]e better choices."

Mother's and Father's deemed admissions state that they both used illegal drugs, abused alcohol, and were imprisoned during the twenty-four months preceding their answers; Grandmother's trial counsel told the court that the discovery had been received by the parents on September 5, 2012 and was therefore due October 4, 2012. In Mother's written answers to the requests for admissions, which were admitted without objection,[9] she denied that she and Father had abused alcohol within the last twenty-four months. She admitted in

---

[9] *See id.*

8

those written answers, however, that within the last twenty-four months, she and Father had used illegal drugs and had been incarcerated. In the answers to her interrogatories, also admitted in evidence with no objection, Mother similarly admitted to using methamphetamine "on[and] off [in] 2010–2011 occas[]ionally."

On May 21, 2012, Mother informed the court that she was in jail and had been since mid-April 2012.

In her testimony, Mother admitted that she had testified in the earlier conservatorship trial in late 2011 that she was still using methamphetamine. She further admitted to having been arrested in September 2011 for possession of methamphetamine of less than one gram and again in April 2012 for a community supervision violation related to that offense. Mother testified that she served about four and one-half months in jail after her community supervision violation. Mother testified that she completed intensive day treatment while she was incarcerated and that she completed six months of aftercare treatment after her release from jail. She admitted that she was currently wearing a drug patch that the community supervision office checked every ten days. She denied that her past drug test "stalls," in which she was allegedly unable to provide a urine sample and which were violations of her community supervision conditions, were also drug test failures. Mother testified that she had been in drug treatment three or four times, that she had been sober eleven months, and that she went to Alcoholics Anonymous (AA) and Narcotics Anonymous (NA) meetings twice a week.

Mother also admitted that she and Father had had a "series of domestic violence issues" but insisted that that was in their "past." She remembered that the trial court had instructed her to stay away from Father but admitted that she had not done so. She further admitted to having gone to a bar/grill with him about three weeks before trial, having argued with him, and having left the bar on her own. She denied having a physical altercation with him.

Father admitted at trial that he had a history of domestic violence, that the children were present "[a] couple times" when it occurred, and that that exposure was not "good for" them. Father further admitted that he was at a bar with Mother about a month before trial and that they argued. He denied that the argument was violent. He testified that he had not had alcohol for "a few months" and denied that either he or Mother drank alcohol at the bar.

Father also admitted that he went to jail for traffic warrants for a period of about eight days on the same day that Mother was arrested for the possession of methamphetamine, and he further admitted that it is difficult to "be a father to kids when you're in and out of jail." Grandmother said that the parents had never stopped using drugs during the pendency of the case.

The trial court therefore heard evidence of domestic violence in the children's presence, recurrent drug abuse, alcohol abuse, drug relapses, and incarceration of both parents, at least once during the same period. The trial court further heard that Mother had ignored the trial court's advice to stay away from Father, that the two had argued publicly in a bar/grill three weeks before

10

trial, and that the argument resulted in Mother leaving the bar/grill alone. Reviewing all the evidence in the light most favorable to the finding and judgment,[10] we hold that the trial court could have reasonably formed a firm conviction or belief that the parents knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical and emotional well-being, and we therefore hold the evidence legally sufficient to support the trial court's endangerment finding.[11] Reviewing all the evidence with appropriate deference to the factfinder,[12] we hold that the trial court likewise could have reasonably formed a firm conviction or belief that Mother and Father knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical and emotional well-being, and we therefore further hold the evidence factually sufficient to support the trial court's endangerment finding.[13] We overrule the parents' first issue.

**Best Interest Evidence**

In the parents' fourth issue, they contend that the evidence is legally and factually insufficient to support the trial court's finding that termination of the

---

[10]*See In re J.P.B.,* 180 S.W.3d 570, 573–74 (Tex. 2005).

[11]*See* Tex. Fam. Code Ann. § 161.001(1)(D).

[12]*See In re H.R.M.,* 209 S.W.3d 105, 108 (Tex. 2006); *In re C.H.,* 89 S.W.3d 17, 28 (Tex. 2002).

[13]*See* Tex. Fam. Code Ann. § 161.001(1)(D).

parent-child relationship is in the children's best interest. The above evidence on endangerment is also relevant to a best interest determination.[14]

In addition to the deemed findings discussed above on the endangerment issue, the following facts were also deemed admitted against the parents because of their failure to timely answer Grandmother's requests for admissions:[15]

- that termination of the parents' rights would be in the children's best interest;

- that either parent having primary custody of the children would not be in their best interest;

- that removing the children from Grandmother's primary possession would emotionally harm them;

- that remaining with Grandmother would be in the children's best interest;

- that Grandmother should continue to be the person determining the children's primary residence and making their educational and medical decisions;

- that the children had said that they want to live with Grandmother;

- that the parents had not had unsupervised visits with the children for three years before the discovery deadline;

- that the parents had not been to any medical or dental appointments for the children in the last three years before the discovery deadline;

---

[14]*See C.H.*, 89 S.W.3d at 28.

[15]While answers constituting admissions of law are not binding on a court, a request for admission may properly ask a party to apply the law to a set of facts. *See* Tex. R. Civ. P. 198.1; *Duong v. Bank One, N.A.*, 169 S.W.3d 246, 251 (Tex. App.—Fort Worth 2005, no pet.). The parents cite no authority for their contention that whether termination is in a child's best interest is legal issue.

- that the parents had not attended any parent-teacher conferences or visited the children's school in the last three calendar years;

- that Grandmother had financially supported the children with no help from the parents for at least the last twenty-four months preceding the discovery deadline;

- that the parents had provided no financial support for the children as child support in the last twenty-four months before the discovery deadline;

- that the parents had not provided medical insurance for the children for the last three years before the discovery deadline; and

- that the parents had provided no clothing for the children in the twenty-four months preceding the discovery deadline.

In her written answers to the requests for admissions that were admitted into evidence without objection, Mother denied that

- the children had expressed a desire to live with Grandmother;

- the children's best interest would be to remain in Grandmother's possession;

- it would emotionally harm the children to be removed from Grandmother's primary possession;

- Grandmother should remain the person responsible for determining the children's primary residence and making their educational and medical decisions;

- it was not in the children's best interest to be in the parents' primary custody;

- it was in the children's best interest for the parents' parental rights to be terminated;

- Grandmother had provided financial support for the children without the parents' assistance for at least the last twenty-four months before the discovery deadline;

- Mother had failed to pay child support for at least the last twenty-four months before the discovery deadline; and

13

- the parents had not provided any clothing for the children within the last twenty-four months or medical insurance for the last three years preceding the discovery deadline.

Mother also contended in her answers to the requests for admissions that the reasons that the parents had not attended any medical or dental appointments or parent-teacher conferences or visited the school were that Grandmother did not tell the parents about the appointments and that Mother believed that the court order prohibited the parents from going to the appointments or the school. We note that no order in the clerk's record contains such provisions; the orders do consistently require that all visits (excluding telephone visits) between the parents and the children be supervised by Grandparents, Grandma, or some "other competent designated adult."

In her answers to the interrogatories, Mother stated that she did "not feel [that she] need[ed] to be supervised with [her] own children" and that she did not believe her parental "rights should be terminated at all." She wrote, "I deserve my kids[.] They are <u>MY</u> kids. And I am a good mom. I have made mistakes. But do not anymore." Additionally, Mother answered that she should be the children's JMC with the exclusive right to designate their primary residence "[b]ecause [she is] their mother."

Mother further answered in the interrogatories that only she and Father should have possession of and access to the children and that Grandmother should not be appointed SMC because Mother "fe[lt Grandmother] ha[d the] children under p[hys]ical [and] mostly emotional harm." Mother further opined

14

that both children needed counseling "due to their living conditions." She answered that she did "not know" any information about the children's extracurricular activities because Grandmother "d[id] not share any information with [her] about [the] children." Mother contended in her answers that Grandmother denied her "any kind of contact to [the] children" and called her "foul names."

Mother further answered that "[w]hoever ha[d] the[ children] should provide [health insurance] for them."

Our review of the record yields no copy of the TDFPS service plan for the parents in the clerk's record or exhibits, but we note that it was alluded to in the clerk's record. Mother completed Community Addiction Treatment Services (CATS) in August 2009, systematic training for effective parenting (STEP) in August 2009, and anger management and chemical dependency group treatment in September 2009. She also attended individual and couples counseling with Positive Influences, which she had begun in March 2009, and completed her psychological evaluation. Again, though, Mother admitting using methamphetamine in 2010 and 2011 and being arrested for possessing it in September 2011, all of which followed her completion of or participation in these services.

While in jail during the months of June through August 2012 for her community supervision violations regarding multiple stalled drug tests, Mother was diagnosed with amphetamine dependence and completed the ninety-day

15

intensive outpatient portion of the intensive day treatment program offered by the community supervision department. By February 14, 2013, she had satisfactorily completed both the intensive day treatment program and the six months of aftercare treatment. She testified that she had been sober eleven months and attended NA and AA twice a week.

Father was progressing well in CATS as of September 2009, having completed fifteen of twenty-four classes; lacked only one parenting class; and had scheduled his psychological evaluation. He too participated in individual and couples counseling at Positive Influences. He had also obtained employment and applied for housing. There is no indication in the record whether Father completed any of those services. Both parents had negative drug tests in the period of June–September 2009.

Father completed the anger control program of Opportunities Counseling Center on January 9, 2013.

Although each parent had been ordered to pay $50 per month of child support to Grandmother with the first temporary order signed in April 2009, the parents complied with that order only rarely. The child support record admitted with no objection shows that Mother made only eight $50 payments and one $40 payment during the period of almost four years from the date child support was imposed through the date of the March 2013 trial. Mother admitted that she last made a payment on February 23, 2011 and that her family provided a June 8, 2012 payment to "help [her] out" while she was in jail and not working. She

16

conceded that more than a year passed between her February 23, 2011 payment and the May 2012 filing of the petition to terminate. Mother admitted that she had had plenty of time from her date of release from jail—August 23, 2012—to make child support payments. Mother pointed to her incarceration, lack of job stability, and fixed income as bases for her failure to pay child support as ordered. She admitted that she had been a Subway employee since December 21, 2012.

Father admitted to making no child support payment until the Friday before trial, when he paid $50, but he testified that he and his father "would help [Grandmother] out when she needed help with the kids."

Mother also testified,

> I love my kids very much, I do, and I've made a lot of bad choices, which is very clear to everybody in this courtroom, but I don't think it's that clear that I do care and love my children more than anything and I do want what's best for them, and I'm asking this Court to please not terminate my rights and allow me to keep proving myself to y'all and to the Court to be able to, one day, have a great relationship with my children and maybe possibly have them back.
>
> And that's pretty much all I've got.

Father was originally very appreciative of Grandmother's helping out and taking care of the children, but by the trial, he no longer believed that she acted in the children's best interest. He explained, "[M]y mother told me if I got my life straight and got a job, was sober, clean, and had a job and house and everything for the kids, she would not mind handing me my kids back."

17

Father further testified,

> I would just like to express to the Court and everybody here, I am a good father. I have made bad mistakes, but everybody makes mistakes in life. I have matured highly in the past year. I have got a job. . . . I've just matured a lot. . . . I'm going to classes, anger management classes, BIP classes, all types of maturing stuff for myself, for the best interest of my kids, because I do want my children back one day and I want to be there to provide for my kids for the rest of their life, and I just . . . think [Grandmother] and even [Grandfather] . . . know me and they know I love my kids very much and they know my kids love me very much. And I've done what my mother has actually asked me before to do, which is get a job, be clean, and live right, and I've done that . . . .

That's all I have.

Grandmother testified that the children were doing well in her home. Daughter was making "straight As" in first grade at a neighborhood elementary school. Son had been in pre-K three hours each school day, but Grandmother withdrew him because of a conflict with her work hours. Grandfather took care of Son during Grandmother's work hours. Grandfather generally worked different hours than Grandmother. Additionally, Grandmother's daughter also watched Son when Grandparents were unavailable. Grandmother admitted that her daughter might have had a drug problem years ago but denied a recent problem.

When asked about her own use of prescribed hydrocodone, Grandmother explained that she took the medicine when her Achilles heel was inflamed. Grandmother testified that she would take hydrocodone "out of necessity" but was not addicted to it. Grandmother admitted that Grandfather also tested positive for hydrocodone on the court-ordered drug test, that he did not have a

18

prescription for the medicine at the time of the test, and that he had taken her hydrocodone without a prescription. Grandmother further testified that she had shared her prescription medicine with Grandfather when he was in pain. She stated that after Grandfather failed the drug test, they found out that it was not a good idea for her to share her prescription medication with him.

Grandfather admitted that he had used hydrocodone without a prescription while the children were living in his home and that he had nonsuited his claims after the drug test came back positive. Grandfather also testified that he loves the children and has "contributed [his] share" to financially supporting the children.

Grandmother testified that she had never "really received any substantial child support from" the parents, which had made life even more difficult. Grandmother stated that she works "[part-time] for a lady—[doing] a lot of things for her, [from] bookkeeping, to cleaning, to managing her apartments" and that Grandfather manages a grocery store. She testified that they are not wealthy. Grandmother admitted that the litigation had cost a lot and had "substantially altered" her retirement plans.

Grandmother initially stated that the children had not visited with the parents while in her possession but later admitted that Father had visited the children while under her supervision. Grandmother also testified that the children had seen their parents while in Grandma's possession and knew information about the court case that Grandma and Mother had told them. Grandmother had

19

not discussed the court case or trial with the children and believed that the knowledge caused them undue stress. Grandmother testified that Daughter had been very emotional and that Son had stated that he did not want to have to leave his home. She testified that the children were scared of leaving their home because they were "used to" Grandparents.

Grandmother testified that she should have the exclusive right to make medical decisions and education decisions because she primarily had possession of the children. Grandmother expressed concern that even if the parents' rights were terminated, Grandma would still allow them to visit the children during her periods of possession, and Grandmother did not believe those visits would be in the children's best interest.

Grandmother further testified that she had lived at her current home for six years and had no plans to move.

Grandmother also testified that the children recognized Grandfather and her as their parents and called them Pawpaw and Mom respectively, even though she had told them that she is their grandmother. Grandmother testified that she loves the children "like they were [her] own," that they will never "want . . . for anything," that she and Grandfather "just want the best for them," and that she believes termination of the parents' parental rights is best for the children.

Grandmother admitted that she had told Father "when [he] was staying with [her] that if [he] kept [his] nose clean and stayed sober, got a job and lived

20

right, that [she] would give [him his] kids back." Grandmother testified that she had told both parents "[t]hat if they got their—got off of the drugs and did the right thing, that they could have their children back," but she stated that by the time of trial, they had still not done so.

Grandmother also admitted that she and Grandma do not get along. Nevertheless, Grandmother testified that she believes that it is in the children's best interest to have a relationship with Grandma.

Grandma testified that some of the pick-ups and drop-offs of the children had not gone smoothly because Grandmother was argumentative, resistant, or abrasive, and Grandma felt threatened. Grandma also stated that

> [t]he children have expressed that they can only say certain things to their grandmother because she gets mad at them and she puts them in time-out when she gets mad at them. So they—they feel they can only share certain things with her.

Grandma also testified that the children had told her many times that they wanted to "go home," meaning to her house or to their parents' home, not Grandmother's. Grandma further testified that she did not think that completely excluding the parents from the children's lives would be in their best interest because it would traumatize them not to ever be able to

> see their parents because, yes, they do—they do love their parents very much, and their parents love them very much, and given the new situation, the new stake in life right now and all the accomplishments, it is a wonderful, positive experience.

> They relate well to their parents and, most certainly, their parents have their best interest at heart.

21

On cross-examination, Grandma confirmed her statement that the parents had the children's best interest in their heart but stated that she did not so believe when the parents were doing methamphetamine in front of the children or when domestic violence between them occurred in front of the children. Grandma testified that absent a court order prohibiting the parents from being around the children, she would allow such visits as long as the parents were not using drugs.

The trial court heard conflicting evidence about where the children wanted to live but heard no evidence about where either parent was living. On the other hand, Grandmother had been in the same home for six years and had no plan to move; the children had therefore been in the same home with her for almost four years and could look forward to the same stable home in the future. The children are obviously bonded with all the adult parties, but the evidence indicates that they called Grandmother "Mom" of their own volition. There was no evidence about any special needs, other than Mother's contention that the children needed counseling.

The parents' fairly recent drug use and confinement in jail after TDFPS had already removed their children, as well as Mother's relapses even after three or four stints in rehab, provide some indication of the emotional and physical danger to the children in their parents' care, as does the parents' failure to take even a token responsibility for supporting the children or to take any independent interest in their lives during the long removal. While the evidence concerning

Grandfather's use of Grandmother's hydrocodone shows a lack of judgment, there was no evidence that Grandparents had any addiction issues.

The parents' own words indicate that they were not ready for the children to be returned to them at the end of trial, and there was no evidence about the parents' plans for the children. Grandmother, on the other hand, discussed the children's schooling, Son's care providers, how she and Grandfather provide for the children financially, and her belief that Grandma and the children should maintain contact, even though Grandmother and Grandma do not get along, because that contact benefits the children.

Viewing all the evidence in the light most favorable to the finding and judgment and considering the nonexclusive *Holley* factors, we hold that the trial court could have reasonably formed a firm conviction or belief that termination of the parental relationship between the parents and the children was in the children's best interest, and we therefore hold the evidence legally sufficient to support the trial court's best interest finding.[16] Similarly, reviewing all the evidence with appropriate deference to the factfinder, we hold that the trial court could have reasonably formed a firm conviction or belief that termination of the parental relationship between the parents and the children is in the children's

---

[16]*See* Tex. Fam. Code Ann. § 161.001(2) (West Supp. 2013); *J.P.B.*, 180 S.W.3d at 573–74; *C.H.*, 89 S.W.3d at 27; *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

best interest, and we therefore hold that the evidence is factually sufficient to support the best interest finding.[17] We overrule the parents' fourth issue.

**Issues Not Reached**

Because a best interest finding and a finding of only one ground alleged under section 161.001(1) of the family code are sufficient to support a judgment of termination,[18] we do not reach the parents' second and third issues,[19] which challenge the findings under subsections (F) and (P).[20] Because we have upheld the trial court's termination of the parent-child relationship, we also do not reach the parents' conditional fifth issue, which challenges the appointment of Grandmother as SMC and Grandma as PC had we reversed the termination order.[21]

**Attorney's Fees**

In their sixth issue, the parents contend that the trial court abused its discretion by awarding $30,000 to Grandmother's trial counsel and against them. They seem to argue both sufficiency grounds and segregation grounds, stating,

---

[17]*See* Tex. Fam. Code Ann. § 161.001(2); *H.R.M.*, 209 S.W.3d at 108; *J.P.B.*, 180 S.W.3d at 573–74; *C.H.*, 89 S.W.3d at 27–28; *Holley*, 544 S.W.2d at 371–72.

[18]*In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.).

[19]*See* Tex. R. App. P. 47.1.

[20]*See* Tex. Fam. Code Ann. § 161.001(1)(F), (P) (West Supp. 2013).

[21]*See* Tex. R. App. P. 47.1.

24

> There was no testimony as to the nature of the preparation, complexity of the case, experience of the attorney, and the prevailing hourly rates. Much of the litigation below was between [Grandmother] and [Grandma] over custodial violations allegedly committed by [Grandmother] and efforts by [Grandma] to determine drug testing. Nothing was said regarding the time preparing for the litigation between [Grandmother and Grandma],

and concluding that "[i]t was an abuse of discretion to award all of the fees against [the parents]." The parents, however, failed to preserve their segregation argument in the trial court.[22] We therefore confine our analysis to their sufficiency complaint.[23]

Section 106.002 of the family code authorizes the trial court to award "reasonable attorney's fees and expenses" in suits affecting the parent-child relationship (SAPCRs), including termination suits.[24] The award of attorney's fees in a SAPCR is within the sound discretion of the trial court.[25] Evidence must support the award.[26] However,

> [s]pecificity . . . is not required. Instead, to support a request for reasonable attorney's fees, testimony should be given regarding the

---

[22]*See Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 389–90 (Tex. 1997); *Hulen v. Hamilton*, No. 02-06-00288-CV, 2008 WL 553812, at *8 (Tex. App.—Fort Worth Feb. 28, 2008, no pet.) (mem. op.).

[23]*See Hulen*, 2008 WL 553812, at *8.

[24]*See* Tex. Fam. Code Ann. § 106.002(a) (West 2008).

[25]*Bruni v. Bruni*, 924 S.W.2d 366, 368 (Tex. 1996); *In re W.M.R.*, No. 02-11-00283-CV, 2012 WL 5356275, at *14 (Tex. App.—Fort Worth Nov. 1, 2012, no pet.) (mem. op.).

[26]*W.M.R.*, 2012 WL 5356275, at *14.

hours spent on the case, the nature of preparation, complexity of the case, experience of the attorney, and the prevailing hourly rates. The court does not need to hear evidence on each factor but can look at the entire record, the evidence presented on reasonableness, the amount in controversy, the common knowledge of the participants as lawyers and judges, and the relative success of the parties.[27]

Grandmother's trial counsel testified about attorney's fees:

> I was hired by [Grandparents] in early . . . 2009 to represent them in this case. This case has been ongoing for a period of three years now. In that time, we have billed approximately—or not approximately—in the amount of $33,742.69. This case has become obscene. It has become a waste to the people who have actually cared for and taken care of these children. I am asking that that dollar amount, Your Honor, be assessed against [the parents], jointly and severally liable, and that's what I'm requesting. I bill at the rate of $225.00 per hour, which is a very customary rate for a lawyer with my accomplishments in this field.

Grandma's trial counsel briefly cross-examined Grandmother's trial counsel, asking only whether he believed that the fees were "both reasonable and necessary" and eliciting an affirmative response. Neither parent chose to cross-examine Grandmother's trial counsel.

The trial court also admitted without objection Grandmother's trial counsel's summary of attorney's fees earned from April 1, 2009 through March 18, 2013, which showed that he billed at a rate of $200 per hour, billed 149.1 hours, and earned $29,820; that an associate also billed at a rate of $200, billed 1.5 hours, and earned $300; that the paralegals who worked on the case billed $125 per hour, billed 17.5 hours, and earned $2,187.50; and that the total fees

---

[27] *Id.* (citations and internal quotation marks omitted).

were $32,307.50. Out-of-pocket costs were listed at $1,435.19, and total fees and costs were $33,742.69.

The trial court also took judicial notice of the court's file, which revealed that Grandmother's trial counsel propounded discovery, filed and responded to several pleadings, and made several court appearances. The trial court also specifically found that

- Grandmother's trial counsel "incurred attorney's fees and costs . . . in the total amount of $30,000.00";

- the attorney's "fees are a reasonable and customary fee for an attorney" with Grandmother's trial counsel's "experience practicing in Tarrant County, Texas";

- Grandmother's trial counsel's "services were for the benefit of the children . . . and were reasonable and necessary to protect the emotional and physical welfare of the children"; and

- Grandmother's attorney "is entitled to recover from [Father and Mother] jointly and severally $30,000.00 over and against the Respondents herein, the amount shall include interest from March 21, 2013, for such fees, costs and expenses."

The parents did not challenge the finding that the services were for the children's benefit and were reasonable and necessary to protect their welfare. Because we hold that there is some evidence to support this finding, it is binding.[28]

Thus, the record provides evidence of the complexity of the case and evidence of Grandmother's trial counsel's preparation, and the trial court's

---

[28]*See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *Inimitable Grp., L.P. v. Westwood Grp. Dev. II, Ltd.*, 264 S.W.3d 892, 902 & n.4 (Tex. App.—Fort Worth 2008, no pet.).

findings reveal knowledge of Grandmother's trial counsel's experience and the customary attorney's fee rate in Tarrant County. The unchallenged finding provides that the attorney's fees were for the children's benefit. Given the evidence, we hold that the trial court did not abuse its discretion by awarding Grandmother's trial counsel $30,000 in attorney's fees. We overrule the parents' sixth issue.

**Conclusion**

Having overruled the parents first, fourth, and sixth issues, which are dispositive, we affirm the trial court's judgment.

LEE ANN DAUPHINOT
JUSTICE

PANEL: DAUPHINOT, MEIER, and GABRIEL, JJ.

DELIVERED: November 7, 2013