

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-14-00123-CV

JOHN HAWKINS                                                      APPELLANT

V.

ANGELA MYERS                                                      APPELLEE

----------

FROM THE 158TH DISTRICT COURT OF DENTON COUNTY
TRIAL COURT NO. 2012-20790-158

----------

## MEMORANDUM OPINION[1] ON REHEARING

----------

Appellant John Hawkins filed a motion for rehearing directed to our December 31, 2014 memorandum opinion and judgment. We grant the motion for rehearing, withdraw our prior opinion and judgment, and substitute the following. *See* Tex. R. App. P. 49.3.

---

[1]*See* Tex. R. App. P. 47.4.

Hawkins appeals from the trial court's summary judgment and sanctions order entered in favor of appellee Angela Myers. We reverse both and remand the case to the trial court for further proceedings.

## I. BACKGROUND

### A. FACTUAL BACKGROUND

Myers and Hawkins worked together at a marketing firm, Fusion Performance Marketing. While at Fusion, Hawkins "generated and supervised" an account for Yum Restaurants International (YRI). Myers also worked on the account. Myers resigned[2] from Fusion in 2009 and formed a new company, Axis Meetings Group, LLC. At some point, Fusion terminated Hawkins.

At the time Myers left Fusion, a job as "Group Manager, Travel and Meeting Services" became available at Frito–Lay. Hawkins had a previous, long-time friendship with Paul Zmigrosky, the "senior VP of procurement for PepsiCo Worldwide," which is the parent company of Frito–Lay. Beginning in "July/August/September" of 2009, Hawkins—either at Myers's request or in response to an inquiry from "an employee of Frito–Lay" about possible applicants for the vacancy—began talking to Zmigrosky about Frito–Lay's possibly hiring Myers. Hawkins believed Myers would be "a good fit" for Frito–Lay and encouraged Zmigrosky to hire her: "I said [to Zmigrosky] that Angela Myers is one of the best operators of any type of meeting programs that I have ever been

---

[2]Hawkins alternately averred that Myers was fired. Myers only stated that she resigned from the job.

around and that she was a very, very worthy person . . . and that he would be remiss if he did not talk to Angela about taking [the position]." Hawkins believed that he "essentially acted both in the capacity as Frito–Lay's recruiter and Myers'[s] negotiator with regard to the available Frito–Lay position."

On September 6, 2009, Hawkins told Zmigrosky that Myers would contact him, presumably for an interview. Zmigrosky told Hawkins on October 1 that Myers had impressed him. On October 8, Myers contacted Hawkins and told him she had not "heard from Frito Lay" and that Fusion had asked Myers if she would "work YRI on a contract basis so [Fusion] doesn't lose the business." Hawkins talked to Zmigrosky who informed Hawkins that a human-resources delay had slowed down his intention to hire Myers. Hawkins then passed this information along to Myers on October 11, told her that she was going to get the job, and advised that she should "try to manage [the YRI business] but you want to be paid your salary for the next 6 months."

On October 15, Myers emailed Hawkins and said she was "worried" about the delay in receiving the employment offer. Myers told Hawkins that YRI would not be putting on a "Leadership Meeting" that year but that she would be working on YRI's "2011 Franchise Convention." The next morning on October 16, Hawkins asked Zmigrosky for a "placement fee" for referring Myers because Hawkins was having "cash flow issues." The record does not reflect whether Hawkins received such a fee, but Zmigrosky seemed unreceptive to Hawkins's request. Later that same day after Zmigrosky had indicated to Hawkins that a

3

placement fee from Frito–Lay might not be forthcoming, Hawkins responded to Myers's email from the previous day, explained the delay—Frito–Lay had "a hiring freeze in place"—and told Myers he would talk to Zmigrosky about speeding things up if Myers "really meant" that he "would be [her] partner in 2011 on YRI." Myers told Hawkins "yes on YRI 2011 . . . since [Hawkins] brokered the arrangement with FL [i.e., Frito–Lay]."

On October 26, Myers told Hawkins that she had been offered the position with Frito–Lay but at a lower salary than she was expecting. Myers and Hawkins then began to exchange emails discussing the details of the job offer, negotiation strategies for Myers, and Myers's possible continued work with YRI.[3] On October 29, Zmigrosky told Hawkins that Myers had accepted the position and would start December 1. Zmigrosky also told Hawkins the terms of Myers's employment including salary, signing bonus, and vacation benefits.

Hawkins asserts that during this timeframe—"October and November of 2009"—he and Myers had agreed to "split the profits, 50/50," from Myers's YRI business in 2011 in exchange for Hawkins's helping Myers get an interview with Frito–Lay and negotiating "her salary, her bonuses, her signing bonuses, start dates[,] and permission to be able to operate the YRI program in 2011 going forward." Hawkins explained the specific terms of their agreement: "For . . . helping get [Myers] the job at Frito–Lay and for . . . securing her the rights to

---

[3]Hawkins mentioned to Myers that he had advised Zmigrosky that Myers should be "allow[ed] to work on YRI."

operate the 2011 YRI program while employed at Frito–Lay[,] [s]he was wanting to split - - make me a partner to profit, slash, revenue . . . on the 2011 program . . . . And I accepted."

On June 22, 2010 after Myers had been working for Frito-Lay for almost seven months, Hawkins contacted Myers to "confirm [their] working relationship for 2011 on YRI [and their] split of the proceeds on that program." Myers cautioned Hawkins that the YRI business would not be as profitable as it had been in the past: "I am concerned about YRI . . . [.] [I]t is not going to make the huge amount of money it has in the past. All billing/payments are going through YRI. I can bill for my hours and a modest management fee." On September 14, Hawkins emailed Myers to again ask about the YRI program: "I would really like to visit with you on YRI. You made me the offer that we would split the profits 50 50 and of course I accepted. Remember you asked me to get [Zmigrosky] to OK you to be able to work on that business before you accepted the job."

On February 14, 2011, Hawkins emailed Myers and expressed his frustration that Myers would not respond about "what [she] proposed and promised last year when [she was] terminated by Fusion." Hawkins again asked that Myers "honor" her agreement to "split 50/50 the compensation on YRI." Myers responded that she would not be making much on the YRI program but stated that "once [she] finish[ed] the program and final billing," she would send Hawkins a "profit statement." Myers stressed that she would be paying Hawkins "1/2 OF THE NET"—gross profit minus expenses and taxes—and not the full

5

amount paid by Fusion for Myers's services. Myers told Hawkins that she "anticipate[d] making about $150,000 BEFORE expenses and taxes."

On June 21, Hawkins emailed Myers asking about "the YRI Program," which he believed had occurred "at the end of May," and questioning whether she needed his social-security number or tax information "for [his] part of the payment." Hawkins continued to ask Myers about payment in multiple emails sent throughout the summer of 2011, several of which Myers did not respond to. On July 6, Myers asked that a form generated by the Internal Revenue Service— a W-9 form—be sent to Hawkins to request his taxpayer-identification number and certification. On July 18, Myers responded to one of Hawkins's inquiries and told him that she would be sending him a check "[a]s soon as the reconciliation is completed." After another email from Hawkins on September 6 confirming that he had sent the W-9 form to Myers and asking "where [Myers was] on the final bill and balancing out of the [YRI] conference," Myers told him that she would let him know when "the billing is done and the profits calculated" and asked him to "stop sending [her] these emails."

On October 14, Hawkins's attorney sent a demand letter to Myers asking for an accounting of the YRI program. Myers responded and asserted that there was no agreement between herself and Hawkins and that any money she would have given Hawkins "would have been a 'gesture of kindness' nothing else." She stated that although her previous intent had been to pay Hawkins, she had not received final payment for the program; therefore, when she was paid, she would

6

not share the payment with Hawkins because Hawkins had hired an attorney. She further claimed that she would not produce the requested accounting because it was "the property of Axis."

## B. PROCEDURAL HISTORY

In 2012, Hawkins sued Myers for breach of contract. He alleged that Myers had "breached the terms of the Agreement by failing to pay the amounts due" him even though he had "fully performed all of his obligations pursuant to the Agreement." *See* Tex. R. Civ. P. 54. Myers answered, asserting several affirmative defenses including illegality and ambiguity. *See* Tex. R. Civ. P. 94.

Hawkins issued a notice of deposition by written questions and a subpoena for the production of documents to YRI. *See* Tex. R. Civ. P. 176.2(b), 176.6(c), 200.1. Attached to these questions was a "Summary of Billing Issues/Profitability" (the summary) that allegedly contained misstatements of fact and allegations of fraud regarding Myers's billing for the YRI program. Myers filed a motion to quash the notice and sought an emergency protective order because she believed the statements in the summary would "interfere with [her] business relationship with [YRI] and cause immediate harm to that business and contractual relationship." *See* Tex. R. Civ. P. 176.6(d)–(e), 192.6. The trial court granted Myers an emergency protective order and ordered Hawkins to stop all efforts to serve YRI with the notice of deposition.

Myers then filed a motion seeking sanctions against Hawkins under rules 13 and 215.3. *See* Tex. R. Civ. P. 13, 215.3. Myers attached her affidavit in

7

which she set out the alleged misstatements in the summary and the harm the notice and subpoena allegedly would cause. Myers previously had also attached this same affidavit to her motion to quash. After a nonevidentiary hearing, the trial court granted Myers's motion for sanctions and ordered Hawkins to pay Myers $5,000 "as reasonable and necessary attorney's fees pursuant to Tex. R. Civ. P. 215.3."

Hawkins filed a motion for summary judgment arguing that he had fully performed under his agreement with Myers and that Myers had breached the agreement by failing to pay him. Myers responded and asserted that Hawkins was not entitled to summary judgment because the agreement "lacks material terms, lacks a meeting of the minds, and violates the statute of frauds." Myers also argued in her response that Hawkins did not show that they intended for the agreement to be mutual and binding. Myers then moved for summary judgment on Hawkins's breach-of-contract claim asserting the same grounds raised in her response to his summary-judgment motion: (1) statute of frauds, (2) no meeting of the minds, (3) undecided or unconfirmed terms, and (4) no intent for Myers to be bound. Hawkins responded to Myers's summary-judgment motion by incorporating his motion for summary judgment.

On October 31, 2013, after hearing the parties' motions, the trial court signed an order denying Hawkins's motion and granting Myers's motion without

specifying on what grounds.[4]  The trial court also overruled Hawkins's objections to Myers's summary-judgment evidence.  Hawkins timely filed a motion for new trial and argued that two of the bases for Myers's motion—"that the contract violated the statute of frauds" and "that the contract was unenforceable due to vagueness"—had not been proved as a matter of law.[5]  The motion was overruled by operation of law.  *See* Tex. R. Civ. P. 329b(c).

Hawkins appeals the trial court's summary-judgment and sanctions orders. In issue one, he asserts that the trial court erred by granting summary judgment in favor of Myers on the grounds she asserted—statute of frauds, no meeting of the minds based on indefiniteness, and no mutuality.  In his second issue, Hawkins argues that the trial court erred by denying his motion for summary judgment because he proved each element of breach of contract as a matter of law.  Hawkins also argues as part of his second issue that the trial court erred by overruling his objections to Myers's summary-judgment evidence attached to her response to his motion for summary judgment.  Hawkins argues in his third issue

---

[4]Although Hawkins raised other claims against Myers, and Myers raised counterclaims against Hawkins, and although the summary-judgment motions solely addressed Hawkins's breach-of-contract claim, Hawkins nonsuited his remaining claims and the trial court dismissed Myers's counterclaims on Myers's motion; thus, the trial court's October 31, 2013 order became final once the remainder of the claims were dismissed.  *See* Tex. R. Civ. P. 96, 162; *In re Bennett*, 960 S.W.2d 35, 38 (Tex. 1997) (orig. proceeding), *cert. denied*, 525 U.S. 823 (1998); *McClure v. JPMorgan Chase Bank*, 147 S.W.3d 648, 652 (Tex. App.—Fort Worth 2004, pet. denied).

[5]In the motion, Hawkins also moved for reconsideration of the trial court's summary-judgment order and to vacate the sanctions order.

9

that the trial court erred by ordering sanctions against him because it failed to comply with the requirements of rule 215.3. In his fourth issue, Hawkins contends that the trial court erred by denying his motion for new trial, which is merely a restatement of the grounds supporting his first three issues.

## II. SUMMARY JUDGMENT

### A. STANDARDS OF REVIEW

We review a summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).

A plaintiff is entitled to summary judgment on a cause of action if he conclusively proves all essential elements of the claim. *See* Tex. R. Civ. P. 166a(a), (c); *MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986). A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010). Once the defendant produces sufficient evidence to establish her right to summary judgment, the burden shifts to the plaintiff to come forward with competent controverting evidence that raises a genuine issue of material fact regarding the challenged element. *Van v. Pena*, 990 S.W.2d 751, 753 (Tex. 1999).

10

A defendant is entitled to summary judgment on an affirmative defense if she conclusively proves all the elements of the affirmative defense by presenting summary-judgment evidence establishing each element of the defense as a matter of law. *Chau v. Riddle*, 254 S.W.3d 453, 455 (Tex. 2008); *Ryland Group, Inc. v. Hood*, 924 S.W.2d 120, 121 (Tex. 1996); *see* Tex. R. Civ. P. 166a(b), (c). If a defendant so establishes her affirmative defense, the burden shifts to the nonmovant plaintiff to show why summary judgment should not be granted. *Lathem v. Kruse*, 290 S.W.3d 922, 924 (Tex. App.—Dallas 2009, no pet.).

When, as here, both parties move for summary judgment and the trial court grants one motion and denies the other, we review both parties' summary-judgment evidence and determine all questions presented. *Mann Frankfort*, 289 S.W.3d at 848; *see Myrad Props., Inc. v. LaSalle Bank Nat'l Ass'n*, 300 S.W.3d 746, 753 (Tex. 2009). When the order granting summary judgment does not specify the grounds upon which the trial court relied, we must affirm the summary judgment if any of the independent summary-judgment grounds is meritorious. *FM Props. Operating Co. v. City of Austin*, 22 SW.3d 868, 872 (Tex. 2000). But we may affirm a summary judgment only on the grounds expressly raised in the motion. *See Stiles v. Resolution Trust Corp.*, 867 S.W.2d 24, 26 (Tex. 1993).

### B. STATUTE OF FRAUDS

As we previously recited, Hawkins attacks the trial court's summary-judgment order and failure to grant a new trial on his breach-of-contract claim in

11

his first, second, and fourth issues. We turn first to whether Myers conclusively established her affirmative defense based on the statute of frauds by producing evidence establishing each element of the defense.

As the party pleading the statute of frauds, Myers bore the burden of establishing its applicability—that the agreements could not be performed within a year of the date of making them. *See* Tex. Bus. & Com. Code Ann. § 26.01(b)(6) (West 2015); *Dynegy, Inc. v. Yates*, 422 S.W.3d 638, 642 (Tex. 2013); *Kalmus v. Oliver*, 390 S.W.3d 586, 589 (Tex. App.—Dallas 2012, no pet.). Myers specifically raised the applicability of the statute of frauds based on section 26.01(b)(6) in her motion for summary judgment and in response to Hawkins's summary-judgment motion. When a promise or agreement, either by its terms or by the nature of the required acts, cannot be completed within one year, it falls within the statute of frauds and is unenforceable unless it is in writing and signed by the person to be charged. *See* Tex. Bus. & Com. Code Ann. § 26.01(a), (b)(6). Whether an agreement falls within the statute of frauds is a question of law, but the determination of whether an exception to the statute of frauds applies is generally a question of fact. *See Dynegy*, 422 S.W.3d at 642; *Kalmus*, 390 S.W.3d at 589; *Vt. Info. Processing, Inc. v. Mont. Beverage Corp.*, 227 S.W.3d 846, 853–54 (Tex. App.—El Paso 2007, no pet.).

In deciding whether an agreement is capable of being performed within one year, we compare the date of the agreement to the date when the performance under the agreement is to be completed. *See* Tex. Bus. & Com.

12

Code Ann. § 26.01(b)(6); *Young v. Ward*, 917 S.W.2d 506, 508 (Tex. App.—Waco 1996, no writ). If there is a year or more between those two dates, a writing is required to render the agreement enforceable. *Young*, 917 S.W.2d at 508.

Myers attached to her motion for summary judgment and to her response to Hawkins's motion for summary judgment Hawkins's deposition testimony in which he stated that he and Myers had agreed to split the profits from the 2011 YRI program in exchange for Hawkins's help in getting Myers the job with Frito–Lay in October 2009. Further, Hawkins admitted in Myers's request for admissions, which Myers attached to her motion for summary judgment, that they entered their agreement in 2009. The summary-judgment evidence shows that although Hawkins began asking Myers to "confirm" their agreement in June 2010 and continued to ask Myers to recognize their arrangement in the months following, Hawkins did not request payment until June 21, 2011—after Myers completed the YRI program sometime in late May 2011. The oral agreement Hawkins seeks to enforce was entered into in 2009, but the YRI program that would trigger payment to Hawkins under the agreement did not occur until May 2011. The contract could not be performed within one year; thus, the statute of frauds applied, rendering the agreement unenforceable in the absence of a writing. *See Dynegy*, 422 S.W.3d at 641.

Accordingly, Myers established her affirmative defense as a matter of law, shifting the burden to Hawkins to raise a fact issue on an exception to the

13

application of the statute of frauds. *See id.* at 641–42 (recognizing that party seeking to avoid statute of frauds bears burden to establish an exception taking the oral contract out of the statute of frauds). Hawkins asserted in his motion for summary judgment and in response to Myers's summary-judgment motion that he had fully performed his obligations under the agreement, which exempts an oral contract from the application of the statute of frauds.[6] *See In re Fairchild Aircraft Corp.*, 6 F.3d 1119, 1128 (5th Cir. 1993) (citing *Pou v. Dominion Oil Co.*, 265 S.W. 886, 888 (Tex. 1924) for the proposition that full performance takes oral contract out of the statute of frauds); *Miller v. Roberts*, 18 Tex. 16 (1856) ("[W]here one side of a contract is to be performed within a year, and is so performed, it is no objection to the enforcement of the contract, under the statute of frauds, that it is not in writing, although the other side of the contract may be in its nature incapable of performance within a year."); *see also Davis v. Insurtek, Inc.*, No. 05-09-01029-CV, 2010 WL 5395668, at *3–4 (Tex. App.—Dallas Dec. 30, 2010, no pet.) (mem. op.); *McElwee v. Estate of Joham*,

---

[6]Other than his objections to Myers's summary-judgment evidence, Hawkins's summary-judgment response was only a statement that he incorporated his motion for summary judgment and all supportive evidence into his summary-judgment response. Myers seems to assert that Hawkins waived the full-performance exception by failing to explicitly restate this ground in his summary-judgment response. We conclude that Hawkins's statement in his summary-judgment response that he was incorporating his summary-judgment motion—which was only three pages in length—was sufficient to raise the full-performance exception in his response such that it was sufficiently raised in the trial court. *See In re Consolidated Freightways, Inc.*, 75 S.W.3d 147, 152 (Tex. App.—San Antonio 2002, orig. proceeding).

14

15 S.W.3d 557, 559 (Tex. App.—Waco 2000, no pet.); *626 Joint Venture v. Spinks*, 873 SW.2d 73, 76 (Tex. App.—Austin 1993, no writ); *Estate of Kaiser v. Gifford*, 692 S.W.2d 525, 526 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.); Restatement (Second) of Contracts § 130(2) & cmt. d (1981). Indeed, "[w]here a contract is executed on one side and nothing remains but the payment of the consideration, this may be recovered notwithstanding the Statute of Frauds."[7] *Machann v. Machann*, 269 S.W.2d 826, 828 (Tex. Civ. App.—Waco 1954, writ ref'd n.r.e.); *see also Holland v. W.C. Belcher Land Mortg. Co.*, 248 S.W. 803, 807 (Tex. Civ. App.—Fort Worth 1922, writ dism'd w.o.j.) (holding statute of frauds inapplicable to promise to convey land where land was actually conveyed within one year of agreement).

Hawkins proffered summary-judgment evidence that he fully performed his duties under the alleged oral contract. He stated in his summary-judgment

---

[7]We recognize that the exception of *partial* performance requires strong evidence that Hawkins suffered a substantial detriment for which he has no adequate remedy, that Myers would reap an unearned benefit, and that Hawkins's partial performance was unequivocally referable to the alleged oral contract. *See Nat'l Prop. Holdings, L.P. v. Westergren*, No. 13-0801, 2015 WL 123099, at *5 & n.2 (Tex. Jan. 9, 2015); *Exxon Corp. v. Breezevale Ltd.*, 82 S.W.3d 429, 439 (Tex. App.—Dallas 2002, pets. denied); *Wiley v. Bertelsen*, 770 S.W.2d 878, 882 (Tex. App.—Texarkana 1989, no writ) (citing *Chevalier v. Lane's, Inc.*, 213 S.W.2d 530, 533–34 (Tex. 1948)). But partial performance as an exception to the application of the statute of frauds is separate and distinct from the exception of full performance. *Davis*, 2010 WL 5395668, at *4 n.3; 49 David R. Dow & Craig Smyser, *Texas Practice Series: Contract Law* § 4.34 (2005); 41 Tex. Jur. *Frauds, Statute of* § 117 (2007). We do not address partial performance as it was not raised by Hawkins nor addressed by Myers in the trial court.

affidavit that on Myers's behalf, he negotiated Myers's compensation package and ensured she could continue to manage events for YRI after her employment with Frito–Lay. Hawkins attached to his affidavit emails between himself and Myers in which Myers acknowledged that she would pay him part of her compensation from the 2011 YRI program and requested his help in getting and negotiating the terms of the Frito–Lay job. Hawkins also asserted facts raising his full performance in his discovery responses, which Myers attached to her motion for summary judgment. *See* Tex. R. Civ. P. 166a(c). This evidence raised a genuine issue of material fact regarding the exception of full performance. Therefore, to the extent the trial court granted Myers judgment as a matter of law based on the statute of frauds, the summary judgment was in error.

## C. MEETING OF THE MINDS

Myers argued in the trial court and now on appeal that she was entitled to judgment as a matter of law on Hawkins's breach-of-contract claim because the essential terms of the alleged oral contract—what expenses Myers could deduct from the YRI payment, what constituted "net profits," and the duration of the contract—were either uncertain or open to future negotiation. The elements of an enforceable contract are (1) an offer, (2) an acceptance, (3) a meeting of the minds, (4) each party's consent to the terms, (5) execution and delivery of the

contract with the intent that it be mutual and binding, and (6) consideration.[8] *Coleman v. Reich*, 417 S.W.3d 488, 491 (Tex. App.—Houston [14th Dist.] 2013, no pet.). Myers essentially attacks whether there was a meeting of the minds between her and Hawkins and, therefore, challenges the evidence to support the third element of Hawkins's breach-of-contract claim. *See* 49 Dow & Smyser, *supra* note 7, at § 1.11 ("The most common reason . . . for a failure of the parties' minds to meet is that there is disagreement as to one or more material terms of the ostensible contract."). For the reasons that follow, we conclude that genuine issues of material fact regarding this element of Hawkins's breach-of-contract claim precluded summary judgment. *See, e.g.*, *Harris v. Balderas*, 27 S.W.3d 71, 77–79 (Tex. App.—San Antonio 2000, pet. denied).

Whether or not the parties formed a contract is a fact question.[9] *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221–22 (Tex. 1992); *Harris*, 27 S.W.3d at 79. For a court to conclude that an enforceable and legally binding contract existed, the contract must be sufficiently definite, certain, and clear in its essential terms. *Fort Worth ISD v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000); *T.O. Stanley*, 847 S.W.2d at 221; *S. v. Goetting*,

---

[8]The elements of a written contract and an oral contract are the same and must be present in order for it to be binding. *Hubbard v. Shankle*, 138 S.W.3d 474, 481 (Tex. App.—Fort Worth 2004, pet. denied).

[9]The follow-up inquiry—whether a formed contract was enforceable—is a question of law. *McCalla v. Baker's Campground, Inc.*, 416 S.W.3d 416, 418 (Tex. 2013).

17

353 S.W.3d 295, 299–300 (Tex. App.—El Paso 2011, pet. denied). But the parties may agree on some terms sufficient to create a contract, leaving other provisions for later negotiation. *Crisp Analytical Lab, L.L.C. v. Jakalam Props., Ltd.*, 422 S.W.3d 85, 89 (Tex. App.—Dallas 2014, pet. denied). The determination of what terms are essential to a contract is determined on a contract-by-contract basis, depending on the subject matter of the contract at issue. *T.O. Stanley*, 847 S.W.2d at 221. The parties must have a meeting of the minds and must communicate consent to the essential terms of the alleged agreement, which is determined based on an objective standard of what the parties said and did rather than on their subjective states of mind. *Baroid Equip., Inc. v. Odeco Drilling, Inc.*, 184 S.W.3d 1, 17 (Tex. App.—Houston [1st Dist.] 2005, pets. denied); *Angelou v. African Overseas Union*, 33 S.W.3d 269, 279 (Tex. App.—Houston [14th Dist.] 2000, no pet.).

Myers first asserts that there was no meeting of the minds because she and Hawkins did not agree what constituted net profits or what expenses she could deduct from YRI's payment before splitting the amount with Hawkins. In his summary-judgment affidavit, Hawkins stated that the course of dealing between Hawkins and Myers when they worked together at Fusion was that profitability of a program was determined after deducting "direct program expenses" from the gross amount paid:

> Items such as employee's personal income taxes, self-employment taxes, annual corporate franchise taxes, personal IRA, 401k or SEP contributions, amounts claimed by Myers for her own labor for the

18

programs . . . , and attorneys' fees not directly related to legal work for the specific program, were not deductible for calculation of profitability of the program. Such items are not deductible as direct program expenses for the purpose of calculating program profit for the 2011 [YRI] Event . . . . Myers'[s] 2011 Federal Income Tax Return states the [$531,383] net profit generated from the 2011 [YRI] Event [was] calculated by subtracting the direct program expenses from gross revenues for such program, for which I am entitled to 50% pursuant to our agreement.

At his deposition, Hawkins testified that he and Myers did not define what net profits were or what expenses she could deduct to arrive at the net-profit amount and that how net profits would be calculated was not discussed until after he filed suit because it was unknown "how the billing was occurring in any sort, form or fashion to even ask a question about anything." In their post-agreement email correspondence, Myers indicated that she understood net profits to equate to her gross profit minus "expenses and taxes." During Hawkins's deposition, Myers proffered as an exhibit her unsworn and unsigned "accounting of the cost of the [2011 YRI] program," which showed that her "Net Income" from that program was $126,913.21.[10] Myers's 2011 tax return, which Hawkins attached as an exhibit to his motion for summary judgment, reflected that the net profit from the program was $531,383, which was arrived at after Myers deducted allowable expenses—$146,481—from the gross income she earned—$677,864.

_____

[10]Myers arrived at this number by deducting $2,944,703.53 for expenses such as "attorney fees," "insurance expense," "retirement fund," "federal income tax," and "website expense" from Axis's "Gross Profit" of $3,071,616.74 realized from the 2011 YRI program. At his deposition, Hawkins disputed that this was a "true accounting."

19

The reasonableness of the expenses Myers attempted to deduct from her gross profits from the 2011 YRI program to arrive at a net-profit amount was not an essential term of the contract. *See Crisp Analytical*, 422 S.W.3d at 89–90. At no point during Myers and Hawkins's one-year correspondence about the agreement or at any time before Hawkins's attorney made a formal demand for payment from Myers did she dispute that she had agreed to split the net profit from the 2011 YRI program with Hawkins. Therefore, we conclude that the meaning of net profit or what expenses could be deducted were not essential terms that precluded enforcement of the oral agreement to evenly split the net profits. *See Burnside Air Conditioning & Heating, Inc. v. T.S. Young Corp.*, 113 S.W.3d 889, 895 (Tex. App.—Dallas 2003, no pet.) (holding in personal-services contract that "the failure to specify a price does not necessarily render the contract so indefinite as to be unenforceable" and that reasonable price could be supplied through evidence of usual and customary fees charged in the industry); *Pennington v. Jerry F. Grukoff, D.O., P.A.*, 899 S.W.2d 767, 770 (Tex. App.—Fort Worth 1995, writ denied) (holding personal-services, oral contract enforceable even though parties failed to specify a price and presuming reasonable price intended); *see also Crisp Analytical*, 422 S.W.3d at 90 ("Although Crisp argues in its brief other essential elements were missing from the [oral] contract, such as how to determine the reasonableness of expenses, it cites no authority holding such terms are essential to the enforcement of a contract."). *See generally Bendalin v. Delgado*, 406 S.W.2d 897, 900 (Tex.

20

1966) ("Where the parties have done everything else necessary to make a binding agreement for the sale of goods or services, their failure to specify the price does not leave the contact so incomplete that it cannot be enforced. In such a case it will be presumed that a reasonable price was intended.").

Myers also argues that the oral agreement fails for indefiniteness because there was no meeting of the minds on the duration of the agreement, i.e., "for what years and for how long is the contract covering the YRI accounts to be in effect (2011, or 2013, or 2015)." In response to Myers's discovery request, Hawkins admitted that his agreement with Myers to split the net profits applied to YRI programs in 2011, 2013, and 2015. At his deposition, however, Hawkins testified that their agreement only extended to the 2011 YRI program "after going back and reading the e-mails." Hawkins alleged that their agreement was to split the net profits only from the 2011 YRI program and requested enforcement only as to 2011. In his amended petition filed the same day as his deposition, Hawkins did not plead for recovery of any amounts regarding the 2013 or 2015 YRI programs and specifically alleged that their agreement solely extended to the 2011 YRI program. Myers expressly agreed to split the net profits from the 2011 YRI program "since [Hawkins] brokered the arrangement with [Frito–Lay]." Therefore, the duration of the agreement, even if deemed an essential term, is not in dispute. *Cf. Inimitable Grp., L.P. v. Westwood Grp. Dev. II, Ltd.*, 264 S.W.3d 892, 899 (Tex. App.—Fort Worth 2008, no pet.) (recognizing

21

absence of contract duration not always considered essential term barring enforcement of oral agreement).

## D.  MUTUAL AND BINDING

Myers additionally argued in the trial court and now on appeal that she was entitled to summary judgment on Hawkins's breach-of-contract claim because he failed to prove that there was an execution and delivery of a contract with the intent that it be mutual and binding.  In other words, she argued that there was no evidence of the fifth element of an enforceable contract.  In the trial court, Myers's argument was one sentence and merely recited that Hawkins failed to prove the fifth element with no further discussion.  On appeal, Myers refines her argument to assert that there was no "intent that it be mutually binding upon her in 2009," the inception of the alleged agreement.  In the absence of a written agreement, whether the parties objectively intended for the agreement to be mutual and binding is a question of fact.  *Karns v. Jalapeno Tree Holdings, L.L.C.*, No. 08-13-00314-CV, 2015 WL 737926, at *5 (Tex. App.—El Paso Feb. 20, 2015, no pet. h.).

We conclude that the summary-judgment evidence, particularly Hawkins's and Myers's emails and Hawkins's affidavit statements raised a genuine issue of material fact on their objective intent that the agreement be mutual and binding.  *See Rice v. Metro. Life Ins. Co.*, 324 S.W.3d 660, 671–72 (Tex. App.—Fort Worth 2010, no pet.).  Further, mutuality is applied and determined when enforcement is sought, not when the promises were made as argued by Myers.

22

*Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 224 (Tex. App.—Fort Worth 2009, pet. denied), *cert. denied*, 559 U.S. 1036 (2010).[11]

### E. SUMMARY

Genuine issues of material fact regarding whether Hawkins and Myers entered into an oral contract and whether Hawkins fully performed such that the statute of frauds was inapplicable precluded entry of summary judgment in favor of either Hawkins or Myers.[12]   Therefore, the trial court correctly denied Hawkins's summary-judgment motion but improperly granted Myers's motion. We sustain Hawkins's first issue.  We overrule Hawkins's second issue attacking the denial of his summary-judgment motion.   Because Hawkins's arguments regarding the denial of his motion for new trial are the same as his summary-judgment arguments, we need not address issue four.  *See* Tex. R. App. P. 47.1.

---

[11]Even if we concluded there was a lack of intent that the agreement be mutual and binding at the time it was made, Hawkins fully performed, which conferred a benefit on Myers, i.e., her employment with Frito–Lay and ability to profit from the YRI 2011 program.   Therefore, Myers would be precluded from contesting this element of contract formation.  *See Cherokee Commc'ns, Inc. v. Skinny's, Inc.*, 893 S.W.2d 313, 315–16 (Tex. App.—Eastland 1994, writ denied).

[12]We do not address those portions of Hawkins's second issue regarding the overruling of his objections to Myers's summary-judgment evidence because the remaining summary-judgment evidence revealed the existence of genuine issues of material fact regarding Hawkins's breach-of-contract claim, precluding entry of judgment as a matter of law.  *See* Tex. R. App. P. 47.1; *ABT Galveston Ltd. P'ship v. Galveston Cent. Appraisal Dist.*, 137 S.W.3d 146, 154 n.21 (Tex. App.—Houston [1st Dist.] 2004, no pet.).

## III. SANCTIONS

In his third issue, Hawkins argues that the trial court abused its discretion by ordering sanctions "under Tex. R. Civ. P. 215.3 without a motion for such relief, without an evidentiary hearing, without admission of any exhibits, without any evidence of any wrongdoing, without taking judicial notice of any matter, and without any evidence of attorneys' fees." We review a trial court's imposition of discovery sanctions for an abuse of discretion. *Am. Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006). We will reverse such a ruling only if the trial court acted "without reference to any guiding rules and principles," such that its ruling was arbitrary or unreasonable. *Cire v. Cummings*, 134 S.W.3d 835, 839 (Tex. 2004).

When a trial court concludes that a party has abused the discovery process, the court is authorized to impose a sanction that is appropriate and just under the circumstances. Tex. R. Civ. P. 215.3. Sanctions are appropriate and just if (1) there is a direct relationship between the sanctionable conduct and the sanction imposed and (2) less severe sanctions would not have been sufficient to promote compliance, i.e., the award was not excessive. *See Am. Flood*, 192 S.W.3d at 583; *TransAm. Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991) (orig. proceeding). "A sanction imposed for discovery abuse should be no more severe than necessary to satisfy its legitimate purposes. It follows that a court must consider the availability of less stringent sanctions and whether

24

such lesser sanctions would fully promote compliance." *TransAm.*, 811 S.W.2d at 917.

Here, the record contains no evidence to explain how the trial court arrived at the $5,000 amount of the sanction or whether lesser sanctions were considered. The sanctions order, which was drafted by Myers, does not explain the trial court's reasons for using this amount nor does the record from the hearing. Although Myers's counsel produced an "attorney's fees summary" at the hearing, it was neither admitted into evidence nor included as part of the appellate record. The record is insufficient to allow this court to determine whether the award was excessive or whether the trial court considered lesser sanctions; therefore, we conclude the trial court abused its discretion by awarding $5,000 as a discovery sanction against Hawkins in the absence of a record to support a conclusion that an award of that amount was appropriate and just. *See Union Carbide Corp. v. Martin*, 349 S.W.3d 137, 145–47 (Tex. App.— Dallas 2011, no pet.); *Jones v. Am. Flood Research, Inc.*, 218 S.W.3d 929, 932– 33 (Tex. App.—Dallas 2007, no pet.) (op. on remand). Of course, this conclusion is not a holding that a party must provide proof of necessity or reasonableness of attorney's fees when such fees are awarded as a sanction. *See Scott Bader, Inc. v. Sandstone Prods., Inc.*, 248 S.W.3d 802, 816–17 (Tex. App.— Houston [1st Dist.] 2008, no pet.). We merely conclude that in order for a sanctions award to be considered appropriate and just, the record must show a direct relationship between the conduct and the sanction and that the award was

25

not excessive.  *See Jones*, 218 S.W.3d at 932–33.  We sustain Hawkins's third issue.[13]

## IV.  CONCLUSION

Because genuine issues of material fact preclude summary judgment on Hawkins's breach-of-contract claim, we sustain Hawkins's first issue but overrule part of his second issue.  We sustain issue three based on the trial court's abuse of discretion in awarding sanctions.  We need not address issue four or the remaining portion of issue two.  Accordingly, we reverse the trial court's sanctions order and the trial court's order granting summary judgment in favor of Myers and remand to the trial court for further proceedings consistent with this opinion.  *See* Tex. R. App. P. 43.2(d), 43.3(a).


/s/ Lee Gabriel

LEE GABRIEL
JUSTICE

PANEL:  MEIER, GABRIEL, and SUDDERTH, JJ.

DELIVERED:  April 9, 2015

---

[13]We need not address the remainder of Hawkins's arguments regarding the sanctions award.  *See* Tex. R. App. P. 47.1.